# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VOTEVETS ACTION FUND, | |
| Plaintiff, | |
| v. | Case No. 18-1925 (TJK) |
| UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, *et al.*, | |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

I.     Statutory Background ............................................................................................ 2

     A.    The Federal Advisory Committee Act ................................................... 2

     B.    The Administrative Procedure Act ........................................................ 4

II.    This Lawsuit.......................................................................................................... 5

STANDARDS OF REVIEW ............................................................................................ 6

ARGUMENT ..................................................................................................................... 7

I.     The FAC Should Be Dismissed Under Rule 12(b)(1) for Lack of Standing. .................... 7

     A.    VoteVets Fails to Identify an Organizational Injury................................. 8

     B.    VoteVets' Assertions of Procedural Violations Do Not Relieve It of the Requirement to Demonstrate a Concrete Injury.................................... 10

     C.    VoteVets Cannot Rely on Informational Injury Where It Has Not Plausibly Alleged the Existence of a FACA Committee. ..................................... 12

     D.    VoteVets Has Not Shown Causation or Redressability. ......................... 14

II.    The FAC Should Be Dismissed Under Rule 12(b)(6) for Failure to State a Violation of FACA............................................................................................................... 14

     A.    The FAC Does Not Plausibly Allege that Defendants "Established" a FACA Committee Consisting of the Three Individuals. .................................. 15

     B.    The FAC Does Not Plausibly Allege that Defendants "Utilized" the Three Individuals as a FACA Committee. ................................................... 21

CONCLUSION................................................................................................................. 26

## TABLE OF AUTHORITIES

**CASES**

\* *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton* ("*AAPS*"),
    997 F.2d 898 (D.C. Cir. 1993).................................................................. 1, 2, 3, 16, 18

*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
    787 F.3d 524 (D.C. Cir. 2015)..................................................................................... 7

*ACLU v. Trump*,
    266 F. Supp. 3d 133 (D.D.C. 2017) ............................................................................ 4

*Aluminum Co. of Am. v. Nat'l Marine Fisheries Serv.* ("*Alcoa*"),
    92 F.3d 902 (9th Cir. 1996) .................................................................................. 16, 22

*Arista Records LLC v. DOE*,
    604 F.3d 110 (2d Cir. 2010) ...................................................................................... 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................... 7, 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................... 7

*Browning v. Clinton*,
    292 F.3d 235 (D.C. Cir. 2002).................................................................................... 7

\**Byrd v. EPA*,
    174 F.3d 239 (D.C. Cir. 1999)............................................................... 15, 16, 19, 23

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*,
    No. 14-CV-953 (GK), 2016 WL 7376847 (D.D.C. Dec. 19, 2016)......................... 10

*Ctr. for Law & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005)................................................................................11

*Envtl. Working Grp. v. FDA*,
    301 F. Supp. 3d 165 (D.D.C. 2018) ........................................................................... 9

\**Food & Water Watch v. Trump* ("*FWW*"),
    No. 17-1485-ESH, 2018 WL 6448634 (D.D.C. Dec. 10, 2018).......................... 2, 3, 14, 16, 21

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015).................................................................................. 8, 9

*Food Chem. News v. Young*,
   900 F.2d 328 (D.C. Cir. 1990) .................................................................... 19, 22

*Freedom Watch, Inc. v. Obama*,
   807 F. Supp. 2d 28 (D.D.C. 2011) ...................................................................... 4

*Freedom Watch, Inc. v. Obama*,
   930 F. Supp. 2d 98 (D.D.C. 2013) .................................................................... 18

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) .................................................................... 13, 14

*Grand Lodge of Fraternal Order of Police v. Ashcroft*,
   185 F. Supp. 2d 9 (D.D.C. 2001) ....................................................................... 7

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ........................................................................................... 4

*Historic E. Pequots v. Salazar*,
   934 F. Supp. 2d 272 (D.D.C. 2013) ................................................................... 6

*Huron Envt'l Activist League v. EPA*,
   917 F. Supp. 34 (D.D.C. 1996) ................................................................... 21, 24

*\*In re Cheney*,
   406 F.3d 723 (D.C. Cir. 2005) ................................................................... 1, 3, 18

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
   736 F. Supp. 2d 24 (D.D.C. 2010) ........................................................... 4, 19, 24

*Kaempe v. Myers*,
   367 F.3d 958 (D.C. Cir. 2004) ........................................................................... 7

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ........................................................................................... 6

*Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*,
   No. 17-1354, 2017 WL 3028832 (D.D.C. July 18, 2017) ................................. 13

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................... 8

*Metcalf v. Nat'l Petroleum Council*,
   553 F.2d 176 (D.C. Cir. 1977) ......................................................................... 12

iii

*Nader v. Baroody*,
  396 F. Supp. 1231 (D.D.C. 1975) ................................................................ 21

*Nat. Res. Def. Council, Inc. v. Herrington*,
  637 F. Supp. 116 (D.D.C. 1986) ................................................................. 3

*Nat'l Ass'n of Home Builders v. EPA*,
  786 F.3d 34 (D.C. Cir. 2015)..................................................................... 8

*New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Service*,
  208 F. Supp. 3d 142 (D.D.C. 2016) ......................................................... 9

*People for Ethical Treatment of Animals, Inc. v. Barshefsky*,
  925 F. Supp. 844 (D.D.C. 1996) ............................................................. 19

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015)................................................................ 8

*Physicians Comm. for Responsible Med. v. Horinko*,
  285 F. Supp. 2d 430 (S.D.N.Y. 2003) ................................................ 15, 23

*\*Public Citizen v. U.S. Dep't of Justice*,
  491 U.S. 440 (1989)..................................................................... *passim*

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*,
  810 F.3d 827 (D.C. Cir. 2016).......................................................... 11, 12

*Sec. Indus. & Fin. Markets Ass'n v. U.S. Commodity Futures Trading Comm'n*,
  67 F. Supp. 3d 373 (D.D.C. 2014) ........................................................... 8

*Sofamor Danek Grp., Inc. v. Gaus*,
  61 F.3d 929 (D.C. Cir. 1995)............................................................... 1, 24

*Spokeo, Inc. v. Robins*,
  136 S.Ct. 1540 (2016)......................................................................... 8

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)..........................................................................11

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015)................................................................ 9

*Warth v. Seldin*,
  422 U.S. 490 (1975)........................................................................... 7

*Wash. Legal Foundation v. U.S. Sentencing Comm'n*,
    17 F.3d 1446 (D.C. Cir. 1994)........................................................... 22, 23

*Wash. Toxics Coal. v. EPA*,
    357 F. Supp. 2d 1266 (W.D. Wash. 2004)........................................ 17, 25

*United States ex rel. Conteh v. IKON Office Sols., Inc.*,
    103 F. Supp. 3d 59 (D.D.C. 2015) .......................................................... 26

**STATUTES**

5 U.S.C. App. 2 § 2 .................................................................................... 3

5 U.S.C. App. 2 § 3 ................................................................... 3, 4, 15, 21

5 U.S.C. App. 2 § 5 .................................................................................... 3

5 U.S.C. App. 2 § 7 .................................................................................... 4

5 U.S.C. App. 2 § 9 .................................................................................... 3

5 U.S.C. App. 2 § 10 ............................................................................. 3, 14

5 U.S.C. § 702 ........................................................................................... 4

5 U.S.C. § 704 ........................................................................................... 4

5 U.S.C. §§ 701–706 ................................................................................. 4

**REGULATIONS**

41 C.F.R. part 102-3 .................................................................................. 4

41 C.F.R. § 102-3.25 ............................................................................... 22

41 C.F.R. § 102-3.40 ......................................................................... 18, 19

**RULES**

Fed. R. Civ. P. 12 ................................................................................... 6, 7

**OTHER AUTHORITIES**

5A The Late Charles Alan Wright et al., Federal Practice and Procedure § 1327 (3d ed.)............. 7

## INTRODUCTION

Confusing theoretical possibility with legal sufficiency, Plaintiff's lawsuit is based on the thoroughly discredited premise that the Federal Advisory Committee Act ("FACA") applies to "every formal and informal consultation between the President or an Executive agency and a group rendering advice." *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 453 (1989). Rejecting that interpretation as one that would stifle much of the daily intercourse between the government and the rest of the nation and raise "severe separation-of-powers problems," *In re Cheney*, 406 F.3d 723, 728 (D.C. Cir. 2005), courts have long applied an exceedingly narrow interpretation of what constitutes an "advisory committee" subject to FACA. FACA applies only to committees established, managed, or controlled by the executive branch. *Sofamor Danek Grp., Inc. v. Gaus*, 61 F.3d 929, 936 (D.C. Cir. 1995). Moreover, the committee must have "an organized structure, a fixed membership, and a specific purpose" and must "render [its] advice or recommendations, *as a group*, and not as a collection of individuals." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 913 (D.C. Cir. 1993) ("*AAPS*") (emphasis in original).

After Plaintiff filed its original complaint against Defendants (collectively, the "Department" or the "VA") alleging that three associates of President Trump constitute an advisory committee under FACA because they made recommendations to and asserted influence over the Department, the Department filed a motion to dismiss arguing that VoteVets had not plausibly alleged the existence of a FACA advisory committee under these standards. Plaintiff then amended its complaint to add additional detail regarding a laundry list of VA endeavors drawn from nearly a thousand pages of documents received in response to Freedom of Information Act ("FOIA") requests. But the amended complaint suffers from the same fatal deficiency as the original complaint: VoteVets still does not allege that the three individuals it contends comprised a FACA

1

committee were brought together by the VA; voted, reached consensus, or prepared a report on any specific policy recommendation; took any formal action as a group; or were subject to management or control by the VA.  Rather, the FAC merely paints a picture of the three individuals voluntarily providing *ad hoc* assistance to the Department on subject matter of their own choosing.

While it is an agency's job to make sure that its committees comply with FACA, that is only so if the group at issue is, in fact, an advisory committee within the meaning of FACA. Because the unstructured and informal correspondence alleged in the FAC does not give rise to an advisory committee within the meaning of FACA, Plaintiff can demonstrate neither standing to bring its claims nor a plausible claim to relief.  Indeed, another member of this Court recently dismissed similar allegations of a "de facto" FACA committee, brought by the same counsel representing VoteVets here, for lack of jurisdiction after concluding that the plaintiff had not shown the essential prerequisite of a FACA claim: the existence of an advisory committee subject to FACA.  *See Food & Water Watch v. Trump* ("*FWW*"), No. 17-1485-ESH, 2018 WL 6448634, at *6-11 (D.D.C. Dec. 10, 2018).  This case must be dismissed for the same reason.

## BACKGROUND

## I.      Statutory Background

### A.      The Federal Advisory Committee Act

Congress enacted FACA in 1972 to reduce the growing cost of unnecessary blue ribbon commissions, advisory panels, and honorary boards set up by the government to advise the President and federal agencies.  *See AAPS*, 997 F.2d at 902-03.  The statute seeks to eliminate advisory committees that have outgrown their usefulness and impose uniform procedures on those that are indispensable, thereby ensuring that Congress and the public remain apprised of their existence, activities, and cost.  *Id.* at 903 (citations omitted); *see also* 5 U.S.C. App. 2 § 2.

Groups that meet the definition of an "advisory committee" under FACA must comply with an array of procedural requirements. Among others, they must file a charter prior to commencing their first meeting, 5 U.S.C. app. 2 § 9(c); announce their upcoming meetings in the Federal Register and hold those meetings open to the public unless an exception applies, *id.* § 10(a)(1)-(2); keep detailed minutes of each meeting, *id.* § 10(c); and make their "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents" available for public viewing. *Id.* § 10(b). In addition, FACA requires that membership in each advisory committee be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee[.]" *Id.* § 5(b)(2).

FACA defines an "advisory committee" as "any committee, board, commission, council, conference, panel, task force, or other similar group . . . which is . . . established or utilized by the President, or . . . by one or more agencies, in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government[.]" *Id.* § 3(2). Courts have long recognized, however, that, interpreting this provision literally to apply to any instance in which private parties participated or were influential in executive branch decisionmaking "would effectively stifle much of the daily intercourse between the government and the rest of the nation," *Nat. Res. Def. Council, Inc. v. Herrington*, 637 F. Supp. 116, 119 (D.D.C. 1986), and create "severe separation-of-powers problems[.]" *In re Cheney*, 406 F.3d at 728; *see also, e.g.*, *FWW*, 2018 WL 6448634 at *6 ("Given the serious separation-of-powers concerns inherent in legislation that imposes requirements on executive decision-making, courts interpret FACA narrowly."). To avoid these problems, courts have read the definition of an "advisory committee" under FACA to encompass only organizations that are "directly form[ed]" by the government or a quasi-public organization or managed or controlled by agency officials.

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 32 (D.D.C. 2010) (citing *Food Chem. News v. Young*, 900 F.2d 328, 332 (D.C. Cir. 1990); *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1451 (D.C. Cir. 1994); *Animal Legal Def. Fund, Inc. v. Shalala*, 104 F.3d 424, 431 (D.C. Cir. 1997)).

FACA authorizes the General Services Administration ("GSA") to promulgate administrative guidelines applicable to federal advisory committees.  5 U.S.C. app. 2 §§ 3(1), 7(c).  GSA's FACA-implementing regulations are entitled "Federal Advisory Committee Management" and codified, as amended, at 41 C.F.R. part 102-3.  "These regulations do not necessarily carry the force of law, but they are at very least instructive because the GSA is 'the agency responsible for administering FACA[.]'"  *ACLU v. Trump*, 266 F. Supp. 3d 133, 140 (D.D.C. 2017) (quoting *Pub. Citizen*, 491 U.S. at 465 n.12).

### B.      The Administrative Procedure Act

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, establishes a waiver of sovereign immunity and a cause of action for injunctive or declaratory relief for parties "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute[.]"  *Id.* § 702; *see also Heckler v. Chaney*, 470 U.S. 821, 828 (1985).  These provisions apply only to "*[a]gency action* made reviewable by statute and final *agency action* for which there is no other adequate remedy in a court[.]"  5 U.S.C. § 704 (emphasis added).  The APA does not provide a cause of action for directly suing an advisory committee because an "entity cannot be at once both an advisory committee and an agency[.]"  *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 33 (D.D.C. 2011) (citations omitted).

**II.      This Lawsuit**

On August 16, 2018, Plaintiff VoteVets Action Fund ("Plaintiff" or "VoteVets"), a not-for-profit organization engaged in advocacy regarding issues affecting veterans, filed this lawsuit alleging that the Department violated FACA by soliciting advice and following recommendations from three individuals—Ike Perlmutter, Dr. Bruce Moskowitz, and Marc Sherman (collectively, the "Three Individuals")—without complying with FACA's procedural and disclosure requirements.  *See generally* Compl., ECF No. 1.

After the Department moved to dismiss the original Complaint, ECF No. 8, VoteVets filed a First Amended Complaint ("FAC") on December 6, 2018.  ECF No. 10.  Like the original Complaint, the FAC claims that the Three Individuals are each members of President Trump's social club, Mar-a-Lago in Palm Beach, Florida, and that they constitute a FACA committee because they offered advice to the Department with a collective objective to "'improve the quality of care for our veterans for the long term.'"  FAC ¶¶ 2, 74(e); *see also id.* ¶¶ 4-7.  The FAC, and the documents incorporated by reference in the FAC, generally paint a picture of the Three Individuals individually opining on healthcare delivery and technological challenges facing the VA, sharing those thoughts with the VA, and facilitating introductions to healthcare and technology experts from the private sector that had volunteered to assist the VA in addressing those problems. *See, e.g.*, FAC ¶¶ 32, 36, 45-72.  For example, VoteVets asserts that, in December 2016, before President Trump was inaugurated, the Three Individuals "convened a council of healthcare executives to meet with President-elect Trump" and "brainstorm[] on how to improve and reform" the Department.  FAC ¶ 36(a).  VoteVets further alleges that, after President Trump took office, the Three Individuals participated in telephone calls, emails, and miscellaneous meetings with Department officials or pertaining to Department affairs, such as a tour of a VA hospital, phone

calls with private sector representatives about a range of topics, and calls with the contracting team responsible for implementing a project to reform the VA's digital records system.  FAC ¶¶ 36, 45-72.  During this time, the Three Individuals are alleged to have provided advice regarding, among other things, the possible development of a mobile "app" for veterans, a proposal to use private medical experts to evaluate the VA's surgery programs, the nomination and firing of former-Secretary David Shulkin, a possible campaign to raise awareness regarding veteran suicide, a summit on medical device registries, potential efforts to track human tissue devices, and a mental health initiative.  FAC ¶¶ 36, 43-73.

VoteVets asserts that the involvement of the Three Individuals in these activities was improper because it occurred "without being subjected to [FACA's] transparency requirements[.]"  FAC ¶ 1.  VoteVets seeks, among other requested relief, an order "enjoin[ing] the [Three Individuals] from meeting, advising Defendants, and otherwise conducting [their] business unless and until" their meetings and records are opened to the public and other FACA requirements are followed.  *See* FAC at Prayer for Relief ¶¶ 3, 4-8.

## STANDARDS OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges a federal court's jurisdiction over the subject matter of the complaint.  The plaintiff bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  In deciding whether that burden has been met at the pleading stage, a court generally may presume the truth of any well-pled factual allegations in the complaint but need not and should not accept "'naked assertions devoid of further factual enhancement.'"  *Historic E. Pequots v. Salazar*, 934 F. Supp. 2d 272, 276 (D.D.C. 2013) (citation omitted).  A plaintiff's allegations of jurisdiction should be closely

scrutinized because a court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (citation omitted).

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is not met by "labels and conclusions," *Twombly*, 550 U.S. at 555; rather, a plaintiff must plead specific "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 533 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). In deciding the motion, a court generally must accept the well-pled factual allegations as true and any reasonable inferences drawn from those allegations but not inferences that are "'unsupported by the facts set out in the complaint'" or "'legal conclusions cast in the form of factual allegations.'" *Browning*, 292 F.3d at 242 (citations omitted). The court may independently consider any materials incorporated by reference in the complaint that are integral to the plaintiff's claims. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *see also* 5A The Late Charles Alan Wright et al., Federal Practice and Procedure § 1327 (3d ed.) ("The district court obviously is not bound to accept the pleader's allegations as to the effect of [incorporated materials], but can independently examine the document[s] and form its own conclusions[.]").

## ARGUMENT

### I.     The FAC Should Be Dismissed Under Rule 12(b)(1) for Lack of Standing.

A showing of standing is a "threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The "irreducible constitutional minimum" of standing requires a plaintiff

to demonstrate an injury-in-fact that is: (1) concrete and particularized, and actual or imminent, not conjectural or hypothetical, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). At the pleading stage, "the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Warth*, 422 U.S. at 518).

An organizational plaintiff may satisfy these elements either through its own organizational injury or, under the doctrine of associational standing, by showing that at least one of its members satisfies the injury-in-fact, causation, and redressability requirements. *Nat'l Ass'n of Home Builders v. EPA.*, 786 F.3d 34, 40 (D.C. Cir. 2015). However, to invoke associational standing, a plaintiff "bear[s] the burden of specifically identifying at least one 'member [who] had or would suffer harm' from each challenged agency action." *Sec. Indus. & Fin. Markets Ass'n v. U.S. Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 400 (D.D.C. 2014) (citation omitted). VoteVets has not done so and thus appears to assert standing only on its own behalf.

### A. VoteVets Fails to Identify an Organizational Injury.

The D.C. Circuit has explained that an organizational plaintiff asserting standing on its own behalf must demonstrate, first, a concrete injury to its interests, and second, that it used its resources to counteract that injury. *See, e.g.*, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation omitted). To satisfy the first element of this standard, an organization cannot rely on "'a mere setback to [its] abstract social interests'" but rather must allege a "'concrete and demonstrable injury to [its] *activities*[.]'" *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (emphasis added, citations and quotation marks omitted). Stated otherwise, the organization may not rest on an alleged impairment of its

policy goals but must show that the defendant's actions demonstrably harmed its "daily operations" or its "ability to provide services." *Food & Water Watch*, 808 F.3d at 919 (citations and internal quotation marks omitted); *see also Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) ("[A]n organization must allege that the defendant's conduct 'perceptibly impaired' [its] ability to provide services[.]"); *Envtl. Working Grp. v. FDA*, 301 F. Supp. 3d 165, 171 & n.4 (D.D.C. 2018) (organization must establish "'inhibition of [its] daily operations" or "ongoing work").

VoteVets' allegations are wholly insufficient to meet this standard. With respect to the first requirement—concrete injury to organizational interests—VoteVets states only that it "has a distinct interest in the Administration's policies towards veterans" and, in particular, expends resources advocating on behalf of its "belie[f] [that] the VA healthcare system should not, and must not, be privatized." FAC ¶¶ 77-78. These allegations merely describe VoteVets' issue advocacy on the subject of privatization; they do not demonstrate, or even suggest, that VoteVets' organizational *activities* are impaired because the Three Individuals offered advice to the Department without complying with FACA's procedural requirements. *See Food & Water Watch*, 808 F.3d at 919 ("an organization's use of resources for . . . advocacy is not sufficient to give rise to an Article III injury" (citations omitted)). Indeed, this would be true even if VoteVets disagreed with a specific policy recommendation offered by the Three Individuals and adopted by the Department, which VoteVets has not alleged. *See, e.g., New England Anti-Vivisection Soc'y v. U.S. Fish and Wildlife Serv.*, 208 F. Supp. 3d 142, 166 (D.D.C. 2016) ("complaining that the organization's ultimate goal has been made more difficult is not sufficient" (citation omitted)).

VoteVets also has not demonstrated that it has expended resources to counteract any specific organizational harm resulting from the alleged FACA violations. Although it alleges that

it submitted a FOIA request for records regarding the role of "private individuals and pro-privatization advocacy groups . . . in influencing the Administration's VA healthcare policy[,]" FAC ¶ 77, this request appears to be simply another component of VoteVets' anti-privatization advocacy.  There is nothing to suggest that the request was made to counteract any impairment to VoteVets' activities resulting from the specific activities of the Three Individuals or that, if the Three Individuals had opened their records and meetings to the public, VoteVets would not have made the request anyway.  Indeed, the ProPublica article on which VoteVets relies for many of its factual allegations and incorporates by reference in the FAC (the "ProPublica Article") notes that "more private healthcare to vets was a signature promise of Trump's campaign" long before he "decided who should lead [that] effort."  Ex. A at 4.  Thus, VoteVets would presumably be seeking documents regarding the privatization efforts of the Department regardless of the activities of the Three Individuals.  *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*, No. 14-CV-953 (GK), 2016 WL 7376847, at *11 (D.D.C. Dec. 19, 2016) ("an organization does not suffer an injury in fact . . . unless [the agency's action] subjects the organization to operational costs *beyond those normally expended*" (emphasis added, citing *Food & Water Watch*, 808 F.3d at 920)).  VoteVets therefore has demonstrated neither a concrete injury resulting from the FACA violations it alleges, nor that it expended resources to counteract any such injury, as is required to make out a claim of organizational standing in this Circuit.

**B.    VoteVets' Assertions of Procedural Violations Do Not Relieve It of the Requirement to Demonstrate a Concrete Injury.**

The standing analysis is not different simply because VoteVets has asserted a violation of procedural rights under FACA.   *See* FAC ¶ 79 (alleging denial of VoteVets' purported "statutory right to review the Mar-a-Lago Council's documents and meeting minutes" and "participate in the Mar-a-Lago Council's meetings").   The D.C. Circuit has made clear that alleged procedural

injuries do not themselves suffice for standing; rather, a plaintiff must demonstrate that the procedural violation "has resulted in an invasion of [the organization's] concrete and particularized interest." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in *vacuo*—is insufficient to create Article III standing").  The D.C. Circuit recently applied this principle in a FACA case to hold that the plaintiff lacked standing to challenge the composition of a FACA committee because it failed to identify a "distinct risk to a particularized interest" resulting from the alleged FACA violation.  *R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 810 F.3d 827, 829 (D.C. Cir. 2016) (citation and quotation marks omitted).  The D.C. Circuit noted that although the advisory committee had submitted a report to the agency, the agency had not yet taken final action based on that report; therefore, the "appointment of the challenged [FACA] committee members by no means rendered the risk of eventual adverse [agency] action substantially probable or imminent."  *Id.* at 830.

This holding applies with even greater force to VoteVets' claims because VoteVets fails to identify any specific policy that was even formally *proposed*, much less adopted, by the Department based on the advice or recommendations of the Three Individuals.  While VoteVets points to brainstorming and other preliminary efforts in which the Three Individuals were involved, such as calls with Johnson & Johnson regarding a public awareness campaign about veteran suicide, discussions concerning a possible mental health initiative, calls with Apple executives and healthcare experts about a mobile app for veterans, review of a proposed contract with Cerner to transform the VA's digital records system, and conversations with the American College of Surgeons ("ACS") about evaluating VA surgery programs, it alleges no facts suggesting that these

11

discussions ever ripened into specific proposals for agency action.  *See* FAC ¶¶ 36(q), 36 (v), 36(ee), 45, 46-60, 64-67, 70, 72.[1]  Indeed, the ProPublica Article states that the Department *demurred* on a proposal by Mr. Perlmutter to use private industry groups to evaluate healthcare delivery, "saying the VA was already developing an in-house method of comparing its services to the private sector," and "clashed" with the Three Individuals "over how to improve the VA's electronic record-keeping software."  Ex. A at 9.  ProPublica also reports that discussions with ACS "stalled after [then-Secretary] Shulkin was fired," *id.* at 6, and that the "VA finally killed the [mobile application] project because Moskowitz was the only one who supported it."  *Id.* at 7. VoteVets cannot stake a claim of Article III injury based on informal input regarding nascent proposals that never developed into specific departmental action.  *RJ Reynolds*, 810 F.3d at 829-31; *Metcalf v. Nat'l Petroleum Council*, 553 F.2d 176, 184 (D.C. Cir. 1977) (holding that plaintiff lacked standing to challenge composition of FACA committee where, among other things, there was "no allegation that [the agency] took action based on" a committee recommendation).[2]

### C.     VoteVets Cannot Rely on Informational Injury Where It Has Not Plausibly Alleged the Existence of a FACA Committee.

VoteVets also does not state a claim of "informational standing."  To establish such a theory, a plaintiff must show that "(1) it has been deprived of information that, on its interpretation, a

---

[1] In fact, although preliminary discussions regarding mental health did not produce specific agency action, a FACA advisory committee on mental health was subsequently formed to assist the VA. The Three Individuals are not members of that committee.  *See* VA Advisory Committee Management Office, Creating Options for Veterans' Expedited Recovery (COVER) Commission, https://www.va.gov/ADVISORY/Creating_Options_for_Veterans_Expedited_Recovery_COVER _Commission_Statutory.asp; *see also* Ex. A at 11.

[2] VoteVets does allege that the Three Individuals were instrumental in the nomination and subsequent "firing" of former-Secretary David Shulkin, FAC ¶¶ 43, 73, but such actions were those of the President, not the Department.  Moreover, VoteVets has not alleged that either the initial nomination of former Secretary Shulkin or his subsequent firing advanced any privatization initiative to the detriment of VoteVets.

statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (citation omitted). A plaintiff asserting such a theory in a FACA case must demonstrate that it "has specifically requested, and been refused" the information that it seeks through its lawsuit. *Public Citizen*, 491 U.S. at 449; *see also id.* at 449-50 (noting that other citizens might make the same complaint "*after unsuccessfully demanding disclosure* under FACA" (emphasis added)); *Friends of Animals*, 828 F.3d at 992 (plaintiff must show that it "seeks and *is denied* specific agency records'" (emphasis added; citation, brackets, and quotation marks omitted)). VoteVets satisfies none of these requirements.

As a threshold matter, VoteVets does not claim that it "requested and *[was] refused*" any specific information to which it claims an entitlement under FACA. *Public Citizen*, 491 U.S. at 449 (emphasis added). After the Department moved to dismiss the original Complaint, VoteVets sent a letter requesting that the VA disclose the documents it purports to seek in this lawsuit. *See* Ex. C (Nov. 27, 2018 letter requesting disclosure of materials "'made available to or prepared for or by'" the Three Individuals). But the FAC states only that "[t]he VA has not responded to VoteVets's request[,]" FAC ¶ 77, which is not surprising given that the request was made just over a week before VoteVets filed its FAC. Even under its own legal theory, VoteVets cannot adequately allege an informational injury where the VA has not actually denied its request.

In any event, VoteVets has not plausibly alleged that it was deprived of information that FACA required the Department to disclose. Although a court must generally assume that a plaintiff's "view of the law wins the day" for purposes of informational standing, *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, 265 F. Supp.

13

3d 54, 65 (D.D.C. 2017), the plausibility requirements of *Twombly* and *Iqbal* continue to apply. Thus, in *Friends of Animals*, the D.C. Circuit did not adopt the plaintiff's implausible legal theory but instead held that the plaintiff lacked informational standing because, under the statutory framework at issue, no disclosure obligation was then in effect.   828 F.3d at 992-94.   Rather, the prerequisite steps necessary to trigger a disclosure obligation under the applicable statute had not yet occurred.   *Id.*   Similarly here, FACA does not impose any disclosure requirements unless and until a FACA "advisory committee" comes into existence.   *See* 5 U.S.C. app. 2 § 10(b); *see also FWW*, 2018 WL 6448634, at *11 n.6 ("Because the Court has concluded that the [alleged] Infrastructure Council was not a de facto FACA committee, plaintiff does not have informational standing to bring these claims.").   As discussed in Section II *infra,* VoteVets fails to plausibly allege the existence of such a committee, and therefore it may not invoke informational standing.

> ### D.    VoteVets Has Not Shown Causation or Redressability.

VoteVets also has not satisfied the second and third prongs of standing.  Any injury that VoteVets might identify cannot be deemed fairly traceable to the Department when the FAC provides no factual support to suggest that a "Mar-a-Lago Council" ever existed within the meaning of FACA.  And any alleged "injury" is not redressable because the Court cannot enjoin the behavior of private individuals that are not subject to management or control by the Department, are not parties to this case, and are not obligated to open their private records and meetings to the public.  *See generally* FAC at Prayer for Relief.

For the foregoing reasons, VoteVets fails to establish Article III standing to bring this case.

## II.    The FAC Should Be Dismissed Under Rule 12(b)(6) for Failure to State a Violation of FACA.

The FAC also should be dismissed because it fails plausibly to allege the existence of an advisory committee subject to FACA.  Contrary to Plaintiff's suggestion, the requirements of

14

FACA do not apply to any group that offers advice to or influences a federal agency. Rather, they apply only to advisory committees "established" or "utilized" by an agency or the President. 5 U.S.C. app. 2 § 3(2). In *Public Citizen*, the Supreme Court observed that "[r]ead unqualifiedly," FACA "would extend . . . to any group of two or more persons, or at least any formal organization, from which the President or an Executive agency seeks advice[,]" 491 U.S. at 452, a result the Supreme Court determined was "absurd" and possibly unconstitutional. *Id.* at 454-67. Thus, the Court "squarely rejected an expansive interpretation of the [statute]," and instead interpreted the terms "'established' and 'utilized' narrowly to prevent FACA from sweeping more broadly than the Congress intended." *Byrd v. EPA*, 174 F.3d 239, 245 (D.C. Cir. 1999) (citing *Public Citizen*, 491 U.S. at 452; *Animal Legal Defense Fund v. Shalala*, 104 F.3d 424, 427 (D.C. Cir. 1997)). The FAC fails as a matter of law because it presses the interpretation "squarely rejected" in *Public Citizen* and in legions of cases since.

### A.   The FAC Does Not Plausibly Allege that Defendants "Established" a FACA Committee Consisting of the Three Individuals.

"[A]n advisory panel is 'established' by an agency only if it is actually formed by the agency[.]" *Byrd*, 174 F.3d at 245 (citation omitted); *accord Physicians Comm. for Responsible Med. v. Horinko*, 285 F. Supp. 2d 430, 445 (S.D.N.Y. 2003) ("*Physicians Comm.*") (citing cases). This requirement means what it says: communications and collaboration between an agency and a group is not enough to find that an agency "actually formed" an advisory committee. *See Physicians Comm.*, 285 F. Supp. 2d at 445 (being informed of efforts and attending group meetings is insufficient; agency must be the "driving force behind" the group and "exert[] control over who attend[s] and what [is] discussed"). Thus, a FACA committee does not come into existence simply because certain individuals meet with "a changing slate of federal officials and private sector groups" for the "purpose of exchanging views on a variety of subjects." *AAPS*, 997 F.2d at 914

(citing *Nader v. Baroody*, 396 F. Supp. 1231 (D.D.C. 1975)).   Nor is a FACA committee "established" by an agency simply because private individuals attend meetings with federal officials on a specified topic.   *See Aluminum Co. of Am. v. Nat'l Marine Fisheries Serv.*, 92 F.3d 902, 906 (9th Cir. 1996) ("*Alcoa*") (holding that a series of meetings attended by a variety of stakeholders, including federal officials, regarding how an agency should comply with a court's ruling was not an advisory committee "established" by the government).   Rather, "[i]n order to implicate FACA, the President, or his subordinates, must *create* an advisory group that has, in large measure, *an organized structure*, a *fixed membership*, and a *specific purpose*."   *AAPS*, 997 F.2d at 914 (emphasis added).   And because "an important factor in determining the presence of an advisory committee [is] the formality and structure of the group[,]" the D.C. Circuit has observed that "it is a rare case when a court holds that a particular group is a FACA advisory committee over the objection of the executive branch."   *Id.*; *see also FWW*, 2018 WL 6448634, at *6 (noting the difficulty in making out "a de facto advisory committee" and that "it is far more often that the government prevails in such cases" (citing cases)).

The FAC fails to plead any specific facts indicating that a committee consisting of the Three Individuals was "actually formed" by the Department.   *Byrd*, 174 F.3d at 245.   Instead, in the single paragraph related to the formation of the purported "Mar-a-Lago-Council" in an otherwise lengthy complaint, the FAC uses the passive voice, alleging that "[i]n January 2017, the Mar-a-Lago Council was created to advise the VA on policy issues affecting veterans and the administration of the Department[.]"   FAC ¶ 28; *see also id.* ¶ 81 (pleading in conclusory terms that the Three Individuals operated as "an advisory committee within the meaning of the FACA because [they are] a 'council . . . established or utilized by' Defendant the VA").   Such conclusory assertions, bereft any detail as to how the alleged creation of a FACA committee came to pass, plainly do

not satisfy VoteVets' burden to allege *facts* plausibly demonstrating that the Department established the Three Individuals as a FACA committee. *See Iqbal*, 556 U.S. at 678 ("'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient); *Washington Toxics Coal.*, 357 F. Supp. 2d at 1273 (rejecting allegation that task force was "established" by an agency where plaintiffs failed to "allege[] facts or point[] to evidence to substantiate their conclusory allegation").

Instead of pleading facts to support its contention that the Department established a "Mar-a-Lago Council," VoteVets includes footnotes to two news articles, suggesting that the support for its assertions lies there. FAC ¶¶ 28-29 & n.7 & 9. But even if it were proper for VoteVets to support a conclusory allegation with unadorned citations to outside materials, neither of the cited articles plausibly suggests that the Department established a "Mar-a-Lago Council." The first, a CNBC transcript of a news conference on January 11, 2017, FAC ¶ 28 n.7, simply contains a transcript of a press conference given by then-President-elect Trump in which he stated that "[w]e're going to be talking to a few people . . . to help" with veterans affairs and "we're going to set up a group" of "some of the great hospitals of the world . . . like the Cleveland Clinic [and] the Mayo Clinic," along with "their great doctors" and that "Ike Perlmutter has been very, very involved[.]" Ex. B at 3-4. The transcript does not so much as mention Mr. Sherman or Dr. Moskowitz, nor does it specify what Mr. Perlmutter was "very, very involved" in or how. Moreover, it does not say anything about the *Department* soliciting Mr. Perlmutter to help with veterans' affairs, which is not surprising given that these comments were made before the President and his appointees were even sworn into office. VoteVets brings this case against the Department, and therefore it must show that the Department, not the President-elect, "established or utilized" the Mar-a-Lago Council. *See* FAC ¶ 81.

In addition, merely soliciting private sector viewpoints—even in a group format—does not give rise to a FACA committee. Instead, to implicate FACA, a committee must have an "organized structure, a fixed membership, and a specific purpose," and be assembled by the government to render advice "*as a group*, and not as a collection of individuals." *AAPS*, 997 F.2d at 913-14 (emphasis in original); *accord In re Cheney*, 406 F.3d at 730 (holding that groups were not subject to FACA where their meetings did not involve "deliberations or any effort to achieve consensus on advice or recommendations" but "were simply forums to collect individual views"); *Freedom Watch, Inc. v. Obama*, 930 F. Supp. 2d 98, 101 (D.D.C. 2013) (noting that "where the President or an agency seeks to provide a mechanism and sounding board to test the pulse of the country by conferring directly or indirectly with widely disparate special interest groups and encourage an exchange of views, the resulting meetings are not subjected to the requirements of the FACA" (citation, quotation marks, ellipses and brackets omitted), *aff'd*, 559 F. App'x 1 (D.C. Cir. 2014); *see also* 41 C.F.R. § 102-3.40(e) (a group "assembled to provide individual advice" is not a committee subject to FACA). Thus, while the President-elect's statement may indicate that he asked *one* of the Three Individuals—Mr. Perlmutter—to advise on certain unspecified matters along with private hospitals and doctors, it hardly demonstrates that the *Department* convened Mr. Perlmutter, *Mr. Sherman,* and *Dr. Moskowitz* to achieve consensus on any specific policy matter, as is VoteVets' burden to allege.

The second news report relied upon by VoteVets, the ProPublica Article, also does not suggest that the Department ever "actually formed" a FACA committee; indeed, it refutes that proposition. The article states that "[w]hen Trump asked . . . for help putting a government together, Perlmutter offered to be an outside adviser," and thereafter "*Perlmutter* enlisted the assistance of his friends Sherman and Moskowitz." Ex. A at 4 (emphasis added). This is also

consistent with the "Statement by Ike Perlmutter, Bruce Moskowitz and Marc Sherman" that is reprinted at pages 40-41 of the FAC, in which the Three Individuals explained that "[w]e *offered* our counsel . . . to assist the President, Secretary and VA leadership . . . ." (emphasis added).  Under binding Circuit law, a group is not a FACA committee if it is brought together by one or more private parties.  That is true even if the executive branch is indirectly responsible for the group's formation.  *See, e.g.*, *Byrd*, 174 F.3d at 246-47 (expert panel was not "established" by agency where federal contractor selected its members pursuant to federal contract, even though agency retained veto power over the panel's membership and set its agenda); *Food Chem. News v. Young*, 900 F.2d 328, 333 (D.C. Cir. 1990) (agency did not "establish" panel where private party selected its members, set its agenda, and scheduled its meetings); *Judicial Watch*, 736 F. Supp. 2d at 33 (dismissing FACA claim because "the plaintiff does not allege that the DOC or any other U.S. government agency selects the U.S. representatives to the" alleged FACA committee); *People for Ethical Treatment of Animals, Inc. v. Barshefsky*, 925 F. Supp. 844, 848 (D.D.C. 1996) (working group was not "established" by agency where, among other things, outside entities named representatives to the group); *see also* 41 C.F.R. § 102-3.40(d) (a group is not subject to FACA if it is "created by non-Federal entities").  Thus, if Mr. Perlmutter enlisted the participation of Mr. Sherman and Dr. Moskowitz, as ProPublica states—or if the three men came together of their own accord as the statement in the FAC suggests—that is enough to demonstrate that the Department did *not* "establish" the group within the meaning of FACA.[3]

Nor do the remainder of the allegations in the FAC show that the Department established the alleged advisory committee.  Those allegations merely recite a laundry list of emails, phone

---

[3] The FAC further underscores the privately-initiated nature of the association by noting that when Mr. Sherman undertook discussions with ACS about evaluating VA surgery programs, it was *Mr. Sherman*, not the VA, that chose to "includ[e] [his] gang as a cc" on those emails.  FAC ¶ 70.

calls, and meetings between one or more of the Three Individuals, private sector representatives, and/or Department officials and conclude that, because some of these discussions in fact "influenced" the Department, the Three Individuals acted as a "council" subject to FACA.  *See* FAC ¶¶ 1, 2, 4-7, 9, 36, 39-73.  Not only does this lack the requisite action by the Department, the "more than 25 meetings" cited in the FAC plainly were not formal meetings designed to produce consensus among the Three Individuals on any specific policy matter; rather, they were informal encounters consisting largely of brainstorming sessions about general initiatives that might be explored, introductions to persons with knowledge or expertise pertaining to those initiatives, and preparations for preliminary information-gathering calls.   They include, for example, a brainstorming session with healthcare executives before President Trump was inaugurated, FAC ¶ 36(a); calls and emails in preparation for a June 14, 2017 call with Apple and various healthcare experts regarding the possible development of a mobile app for veterans, FAC ¶¶ 36(h), 36(p), 36(r), 36(v), 46-60; a meeting to review an agenda for an upcoming meeting between the Secretary and President Trump, *id.* ¶ 36(i); a handful of one-on-one meals between the Secretary and one of the Three Individuals, *id.* ¶¶ 36(m), 36(n), 36(u), 36(y); a tour of a VA hospital, *id.* ¶ 36(o); correspondence between Dr. Moskowitz and VA officials pertaining to the Cerner contract, *id.* ¶¶ 36(aa), 36(bb), 36(ii), 64-67; and exploratory calls with a range of private sector representatives regarding such various and largely unrelated topics as veteran suicide, evaluation of VA surgery programs, tracking of human tissue devices, and mental health.   FAC ¶¶ 45, 70, 71, 72. Furthermore, although the allegations in the FAC attribute each of these actions to the alleged "Council," the documents on which they are based demonstrate that a majority of the correspondence involved only one or two of the Three Individuals, *see, e.g.*, FAC ¶¶ 36(d), (e), (i), (j), (m), (q), (r), (s), (t), (u), (y), (z), (aa), (bb), (cc), (ee), (ff), (gg), (ii) (and materials cited therein),

and none involved the Three Individuals attempting to reach consensus among themselves.  *See generally* FAC.

The FAC therefore suggests nothing more than that the Department received preliminary input regarding a variety of matters from numerous individuals and groups that sometimes included one or more of the Three Individuals.  Such allegations are insufficient to suggest the formation of a FACA committee as a matter of law.  *See FWW*, 2018 WL 6448634, at \*7-8 (rejecting similar claims of a "de facto" FACA committee where there was no indication that preliminary discussions among group members ever matured into formal policy discussions "for the purpose of making group recommendations to the executive" and noting that many of the alleged "'meetings' were not meetings at all but simply email exchanges or phone calls, which apparently did not take place according to a regular schedule" and were "informal exchanges, arranged on an ad-hoc basis, often including only one or two of the purported council members or their staffs"); *Nader*, 396 F. Supp. at 1234 (meeting between government officials and private groups for the purpose of exchanging views did not constitute an advisory committee because the groups "were not formally organized" and there was "little or no continuity" among participants and subject matter); *Huron Envt'l Activist League v. EPA*, 917 F. Supp. 34, 42 (D.D.C. 1996) (rejecting FACA challenge where group had "neither a fixed membership" nor a "specific purpose" and "simply d[id] not have the requisite formality and structure of an advisory committee").

For all of these reasons, VoteVets has not plausibly alleged that the Department "established" a "Mar-a-Lago Council" subject to FACA.

**B.    The FAC Does Not Plausibly Allege that Defendants "Utilized" the Three Individuals as a FACA Committee.**

An entity that is not "established" by the government may only be an advisory committee subject to FACA if it is "utilized" by the government within the meaning of the statute.  5 U.S.C.

21

app. 2 § 3(2).  Yet as with the word "established," the Supreme Court and the D.C. Circuit have given an extremely narrow and specific interpretation to the word "utilize."  In *Public Citizen*, after examining FACA's legislative history, the Supreme Court concluded that the phrase "or utilized" was added to FACA's definition of "advisory committee" "simply to clarify that FACA applies to advisory committees established by the Federal Government in a generous sense of that term, encompassing groups formed indirectly *by quasi-public organizations* . . . 'for' public agencies as well as 'by' such agencies themselves."  491 U.S. at 462 (emphasis added).  The Court therefore rejected the argument that an agency "utilizes" a committee within the meaning of FACA if it "makes use of" the group's work product.  *Id.* at 452, 462-64.  Instead, the Court looked to whether the committee was "*amenable to the strict management by agency officials*" and concluded that an entity formed privately "cannot easily be said to have been 'utilized by a department or agency in the same manner as a Government-formed advisory committee.'"  *Id.* at 457-58 (emphasis added, citation omitted).

Following *Public Citizen*, courts have repeatedly reaffirmed that the term "utilized" means more than simply "used."  *See, e.g.*, *Wash. Legal Foundation*, 17 F.3d at 1450 (holding that "utilized" requires a showing that federal officials exercised "actual management or control of the advisory committee"—a "stringent standard"); *Food Chem. News*, 900 F.2d at 332-33 (holding that "utilized" refers to a group "so closely tied to an agency as to be amenable to 'strict management by agency officials'" (citation and quotation marks omitted)); *Alcoa*, 92 F.3d at 906 (concluding that groups were not "utilized" within meaning of FACA because they were not "subject to the management, much less strict management, of federal agency officials"); *see also* 41 C.F.R. § 102-3.25 (a committee is "utilized" under FACA only "when the President or a Federal office or agency exercises actual management or control over its operation").  Thus, to demonstrate

that the Department "utilized" the Three Individuals as a FACA committee, VoteVets must allege facts showing that the Department exercised "actual management or control" over them.  *Wash. Legal Foundation*, 17 F.3d at 1450.

The sole factual allegation in the FAC even marginally relevant to this requirement is in paragraph 56, where VoteVets cites an email in which VA official Darin Selnick reminded Dr. Moskowitz that Mr. Selnick possessed "'the VA responsibility to provide the overall responsibility to manage and provide oversight for the VA/Apple/Ce[r]ner partnership.'"  However, read in context, it is clear that this email merely clarified that Mr. Selnick was a person with management responsibility *within the VA* on any possible partnership with Apple and therefore needed to be copied on communications pertaining to that potential partnership.  *See* FAC ¶ 56 & n.93 (and email cited therein).  Nothing in the email suggests that Mr. Selnick believed himself or the VA to possess management and control over *the Three Individuals*; indeed, Mr. Sherman and Mr. Perlmutter were not even involved in the discussion at issue.[4]

The remaining allegations in the FAC are similarly insufficient to suggest that the Department "utilized" the Three Individuals as a FACA committee.  While VoteVets asserts that the Department participated in various calls and meetings with the Three Individuals and sometimes adopted their "advice and recommendations," those facts do not show that the Department managed or controlled the Three Individuals.  *See, e.g.*, *Byrd*, 174 F.3d at 246 ("participation by an agency . . . does not qualify as management and control" (citing *Wash. Legal Found.*, 17 F.3d at 1451)); *Physicians Comm.*, 285 F. Supp. 2d at 446 (rejecting FACA claims

---

[4] The discussion continues at pages 255 and 258 of the cited FOIA materials, where Dr. Moskowitz construes Mr. Selnick's email as an "update" responsive to his request that "each organization will add corrections" to a draft list of representatives from numerous organizations.  *See* https://www.oprm.va.gov/docs/foia/DSTBCSto62218Redacted.PDF

because "although EPA was informed about the progress of [a group's] discussions and even attended certain meetings, Plaintiffs have not established that EPA ever managed or controlled the timing, agenda, etc., of the discussions"); *Sofamor Danek Grp.*, 61 F.3d at 936 (holding that panel was not utilized by an agency, notwithstanding fact that agency used its work product, because the agency did not "establish[], manage[], or control[]" the panel); *Judicial Watch*, 736 F. Supp. 2d at 34-35 (allegations that a group "provide[d] policy recommendations to the defendants" were insufficient to state a claim under FACA because they demonstrated only that the agency "'utilize[d]' the [group] in the familiar, colloquial sense" of that term, rather than managed or controlled the committee "*within the meaning of the FACA*" (emphasis added)).   Nor is an allegation that the Department utilized the work product of one or more of the Three Individuals, FAC ¶ 39, the same as alleging that it utilized those individuals as a committee under FACA. Indeed, the D.C. Circuit and the Supreme Court have long "rejected the very claim that the plaintiffs are advancing here: that the FACA is triggered by an agency's mere use of a private group to obtain advice." *Huron*, 917 F. Supp. at 41 (citing *Public Citizen*, 491 U.S. at 457-58 and *Wash. Legal Foundation*, 17 F.3d at 1450-51).

The allegations in the FAC are not only inadequate to meet VoteVets' pleading burden on this point; they refute it.  Far from alleging that the Department managed or controlled the Three Individuals, the FAC asserts that the Three Individuals asserted influence *over the Department*. *See* FAC ¶¶ 39-40 (alleging that the Three Individuals "'bombarded VA officials with demands,'" "'prodded'" them to start new programs, and "exert[ed] sweeping influence on the VA"); *see also id.* ¶ 49 (alleging that Dr. Moskowitz, not the VA, chose areas of focus for a planning call regarding development of a mobile app); Ex. A at 2 (stating that then-Chief of Staff Peter O'Rourke treated an email from Dr. Moskowitz "as an order").   Because these allegations are fundamentally

inconsistent with any suggestion that the Three Individuals were "amenable to the strict management by agency officials," *Public Citizen*, 491 U.S. at 457-58, VoteVets has not plausibly alleged that the Department "utilized" the Three Individuals within the meaning of FACA.

*       *       *       *

At bottom, VoteVets' claims boil down to its assertion that the "Council has broad license to provide advice . . . on all manner of issues affecting" the Department and that "Defendants have utilized such advice and recommendations." FAC ¶ 39. But as courts have repeatedly held, the "fact that a federal agency obtains information or advice from a committee, formally or informally, does not automatically classify the committee as a federal advisory committee subject to FACA regulations, nor does it indicate that the agency 'utilizes' the committee." *Wash. Toxics Coalition*, 357 F. Supp. 2d at 1273 (citation omitted). Thus, simply pairing allegations that the Three Individuals offered advice to and exerted influence over the Department with the conclusory allegation that the Department "established" or "utilized" the group does not make out a FACA claim. Rather, VoteVets must demonstrate that the Department itself formed the Three Individuals into a committee designed to reach consensus and render policy recommendations as a group or that the Department managed or controlled the Three Individuals as a group. The allegations in the FAC do not come close to plausibly alleging such a claim.

VoteVets' failure to satisfy its pleading burden is particularly glaring in light of the fact that VoteVets has access to nearly a thousand pages of documents pertaining to the role of the Three Individuals that were produced by the Department in response to FOIA requests, as well as information contained in the ProPublica Article alleged to have been taken from "interviews with former administration officials[.]" Ex. A at 2 and FAC n.8 & n.17. In some situations, where facts are peculiarly within the possession and control of the defendant," *Arista Records LLC v. Doe*, 604

25

F.3d 110, 120 (2d Cir. 2010), pleading on "information and belief" may be sufficient. But where, as here, a plaintiff already has access to the relevant facts, such allegations, which are insufficient in any event, should be ignored for purposes of Rule 12. *See, e.g.*, *United States ex rel. Conteh v. IKON Office Sols., Inc.*, 103 F. Supp. 3d 59, 66 (D.D.C. 2015) (pleading on information and belief is only permissible "when the information needed to make factual allegations is 'peculiarly within the knowledge of the opposing party'" and the plaintiff "make[s] 'an allegation that the necessary information lies within the defendant's control" (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994)). Given VoteVets' access to voluminous records pertaining to its claims and its 46-page FAC, the absence of any specific factual allegations supporting its theory that the Three Individuals constituted a FACA committee requires dismissal of the case for failure to state a violation of FACA.

## CONCLUSION

For the foregoing reasons, the Department respectfully requests that the FAC be dismissed.


Dated: December 20, 2018                    Respectfully submitted,

                                            JOSEPH H. HUNT
                                            Assistant Attorney General

                                            MARCIA BERMAN
                                            Assistant Branch Director
                                            Federal Programs Branch

                                            */s/ Serena Orloff*
                                            SERENA M. ORLOFF
                                            California Bar No. 260888
                                            Trial Attorney
                                            U.S. Department of Justice, Civil Division
                                            Federal Programs Branch
                                            1100 L Street NW, Room 12512
                                            Washington, D.C. 20005
                                            Telephone: (202) 305-0167
                                            Fax: (202) 616-8470

Serena.M.Orloff@usdoj.gov

*Attorneys for Defendants*