**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

VOTEVETS ACTION FUND,

       *Plaintiff*,

  v.

UNITED STATES DEPARTMENT OF
    VETERANS AFFAIRS, *et al.*,

       *Defendants.*

No. 18-cv-1925

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Adam Grogg (D.C. Bar No. 1552438)
Karianne M. Jones (D.C. Bar No.
   187783)
Javier M. Guzman (D.C. Bar No.
   462679)
Democracy Forward Foundation
1333 H St. NW
Washington, DC  20005
(202) 448-9090
agrogg@democracyforward.org
kjones@democracyforward.org
jguzman@democracyforward.org

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 1

I.      The Federal Advisory Committee Act ........................................................... 1

II.     The Mar-a-Lago Council ............................................................................... 3

ARGUMENT ........................................................................................................... 10

I.      VoteVets Has Plausibly Alleged that the Mar-a-Lago Council Is an Advisory
        Committee Subject to the FACA ................................................................. 10

        A.      VoteVets' Allegations Plausibly Establish that the Mar-a-Lago Council Is a
                Committee with a Fixed Membership ........................................... 11

        B.      VoteVets Has Plausibly Alleged that the VA Established the Mar-a-Lago
                Council ........................................................................................... 14

        C.      VoteVets Has Plausibly Alleged that the VA Has Utilized the Mar-a-Lago
                Council ........................................................................................... 20

II.     VoteVets Has Informational Standing ......................................................... 22

CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................. 10, 24

* *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
  997 F.2d 898 (D.C. Cir. 1993).............................................................................*passim*

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................. 10, 24

*Byrd v. EPA*,
  174 F.3d 239 (D.C. Cir. 1999)...............................................................................*passim*

*Ctr. for Biological Diversity v. Tidwell*,
  239 F. Supp. 213 (D.D.C. 2017).................................................................................. 19

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992)...................................................................................................... 11

*CREW v. Leavitt*,
  577 F. Supp. 2d 427 (D.D.C. 2008)............................................................................. 11

*Cummock v. Gore*,
  180 F.3d 282 (D.C. Cir. 1999)..................................................................................... 23

*In re Cheney*,
  406 F.3d 723 (D.C. Cir. 2005)..................................................................................... 19

*In re Domestic Airline Travel Antitrust Litig.*,
  221 F. Supp. 3d 46 (D.D.C. 2016)............................................................................... 17

*FEC v. Akins*,
  524 U.S. 11 (1998)........................................................................................................ 23

*Food Chem. News v. Young*,
  900 F.2d 328 (D.C. Cir. 1990)..................................................................................... 17

* *Freedom Watch, Inc. v. Obama*,
  807 F. Supp. 2d 28 (D.D.C. 2011).......................................................... 11, 13, 18, 19

*Freedom Watch, Inc. v. Obama*,
  930 F. Supp. 2d 98 (D.D.C. 2013)............................................................................... 19

*Friends of Animals v. Jewell*,
  828 F.3d 989 (D.C. Cir. 2016)............................................................................... 22, 23

*Grell v. Trump*,
    330 F. Supp. 3d 311 (D.D.C. 2018) ........................................................................... 10

*Henderson v. Shinseki*,
    562 U.S. 428 (2011) ..................................................................................................... 4

*Jud. Watch v. Dep't of Commerce*,
    583 F.3d 871 (D.C. Cir. 2009) ................................................................................... 24

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004) ................................................................................... 17

*Nader v. Baroody*,
    396 F. Supp. 1231 (D.D.C. 1975) ....................................................................... 11, 20

*Nuclear Energy Inst. v. EPA*,
    373 F.3d 1251 (D.C. Cir. 2004) ................................................................................. 11

*Nw. Forest Res. Council v. Espy*,
    846 F. Supp. 1009 (D.D.C. 1994) .............................................................................. 19

*Physicians Comm. for Resp. Med. v. Horinko*,
    285 F. Supp. 2d 430 (S.D.N.Y. 2003) .................................................................. 17,18

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) ............................................................................................ *passim*

*Sparrow v. United Air Lines, Inc.*,
    216 F.3d 1111 (D.C. Cir. 2000) ................................................................................. 10

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ............................................................................................... 23

*United States v. Oregon*,
    366 U.S. 643 (1961) ..................................................................................................... 4

*Wash. Legal Found. v. U.S. Sent'g Comm'n*,
    17 F.3d 1446 (D.C. Cir. 1994) ................................................................................... 22

*Wash. Toxics Coal. v. EPA,*
    357 F. Supp. 2d 1266 (W.D. Wash. 2004) ................................................................ 19

## STATUES, RULES, & REGULATIONS

Federal Advisory Committee Act, 5 U.S.C. app. 2

    § 3 ................................................................................................................... *passim*

    § 4 ...................................................................................................................... 2

§ 5 ..................................................................................................................................... 3

§ 10 ............................................................................................................................... 3, 23

38 U.S.C.

§ 7301 ............................................................................................................................... 3

§ 7701 ............................................................................................................................... 3

§ 1110 ............................................................................................................................... 4

§ 1131 ............................................................................................................................... 4

§ 1312 ............................................................................................................................... 4

§ 1521 ............................................................................................................................... 4

§ 2011 ............................................................................................................................... 4

§ 3461 ............................................................................................................................... 4

§ 3702 ............................................................................................................................... 4

§ 3742 ............................................................................................................................... 4

§ 4102 ............................................................................................................................... 4

**MISCELLANEOUS**

Black's Law Dictionary (10th ed. 2014) ........................................................................ 11

Federal Rule of Civil Procedure 12 ............................................................................... 10

H.R. Rep. No. 92-1017 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3491 ................................. 2

Lisa Rein, *Shulkin Unanimously Confirmed to Head Veterans Affairs*, Wash. Post, Feb. 13, 2017,
    https://www.washingtonpost.com/politics/shulkin-unanimously-confirmed-to-head-veterans-
    affairs-department/2017/02/13/b7da5ea8-f236-11e6-b9c9-
    e83fce42fb61_story.html?utm_term=.fb7c5ac2c7cb ........................................................ 4

*Mar-a-Lago Crowd Documents*, ProPublica, at DS-Moskowitz 1 Att 1-2_Redacted,
    https://www.propublica.org/datastore/dataset/the-mar-a-lago-crowd-documents .......................... 5

Press Release, VA, VA Signs Contract with Cerner for an Electronic Health Record System (May 17,
    2018), https://www.va.gov/opa/pressrel/pressrelease.cfm?id=4061 ..................................... 8

VA, About VA, https://www.va.gov/about_va/mission.asp ................................................... 3

VA, Industry Bests: How VA Stacks Up (Feb. 14, 2018),
   https://www.blogs.va.gov/VAntage/45343/industry-bests-how-va-stacks-up/ ............................... 3

VA, Veterans Health Administration, https://www.va.gov/health/ ....................................................... 3

## INTRODUCTION

Congress has long required executive agencies, when they rely on groups of outside individuals for policy advice, to provide the public a window into that work. And when an agency fails to comply with those requirements, embodied in the Federal Advisory Committee Act, Congress has authorized those injured by the lack of transparency to hold the agency accountable in court. For good reason: while agencies must not be deprived of outside expertise, neither must the public be denied opportunities to ensure that groups of private individuals that influence public policy are acting in the public interest.

Plaintiff VoteVets, an advocate for America's veterans, has been denied precisely that opportunity. In violation of the Federal Advisory Committee Act, Defendant the Department of Veterans Affairs has authorized a group consisting of three private citizens, all members of President Trump's Mar-a-Lago Club, to advise the agency on projects and policies of tremendous importance to veterans without permitting veterans and their advocates to monitor the group's work. Because Plaintiff has plausibly alleged that the VA's reliance on this Mar-a-Lago Council triggers the Act's obligations, Defendants' motion to dismiss must be denied.

## BACKGROUND

### I.    The Federal Advisory Committee Act

A sunshine law, the Federal Advisory Committee Act (the "FACA") requires transparency and permits public participation when the executive branch establishes or uses non-federal bodies for the purpose of seeking advice and generating policy. 5 U.S.C. app. 2. When passing the FACA, Congress explained that "[o]ne of the great dangers in [the] unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns," citing as an example an Industrial Waste Committee where "only representatives of industry were present[,]" and "[n]o representatives of conservation,

environment, clean water, consumer, or other public interest groups were present." H.R. Rep. No. 92-1017, at 6 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3491, 3496.

As relevant here, the FACA defines an "advisory committee" as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup . . . which is . . . established or utilized by one or more agencies . . . in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." 5 U.S.C. app. 2 § 3(2).[1] The D.C. Circuit has held that "an important factor" in considering whether a committee has been *established* by an agency is "the formality and structure of the group": "[i]n order to implicate FACA," an agency "must create an advisory group that has, in large measure, an organized structure, a fixed membership, and a specific purpose." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton* ("*AAPS*"), 997 F.2d 898, 914 (D.C. Cir. 1993). And the Supreme Court has held that a committee is *utilized* by an agency within the meaning of the FACA if it is "amenable to . . . strict management by agency officials." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 457-58 (1989).

In keeping with the FACA's purpose to ensure "that Congress and the public remain apprised of [advisory committees'] existence, activities, and cost[,] and that their work be exclusively advisory in nature," *id.* at 446, the FACA requires that: (1) before acting or meeting, an advisory committee must file a charter; (2) the make-up of the committee must "be fairly balanced in terms of the points of view represented and the functions to be performed"; (3) the charter must contain appropriate provisions to "assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by

---

[1] Advisory committees are subject to the FACA's requirements unless they are composed wholly of government employees, 5 U.S.C. app. 2 § 3(2)(i); established by the National Academy of Sciences, the National Academy of Public Administration, *id.* § 3(2)(ii), the Central Intelligence Agency, the Federal Reserve, or the Office of the Director of National Intelligence, *id.* § 4(b); specifically exempted by statute, *id.* § 4(a); or unless they are purely "local civic group[s]" or "[s]tate or local committee[s]," *id.* § 4(c). None of these exceptions applies here.

any special interest, but will instead be the result of the advisory committee's independent judgment"; (4) all meetings must be open to the public; (5) notice of each meeting must be published in the Federal Register; (6) all interested persons must be allowed to attend, appear before, or file statements with the advisory committee; (7) all records, reports, transcripts, minutes, appendices, working papers, drafts, studies, agendas, and other documents made available to or prepared for or by the advisory committee must be available to the public, and (8) detailed minutes of each meeting must be kept. 5 U.S.C. app. 2 §§ 5(b)(2)-(3), 5(c), 9(c), 10(a)(1)-(3), 10(b)-(c).

## II.     The Mar-a-Lago Council

The Department of Veterans Affairs (the "VA") is the second-largest agency in the federal government, behind only the Department of Defense. The VA employs more than 350,000 people in carrying out its mission to, in its words, "fulfill President Lincoln's promise 'To care for him who shall have borne the battle, and for his widow, and his orphan' by serving and honoring the men and women who are America's Veterans."[2] The VA asserts that it is "the largest health care organization in the nation."[3] There can be no doubt that the services it provides are critical, its policies immensely important. The Veterans Health Administration, for example, "provide[s] a complete medical and hospital service for the medical care and treatment of veterans," 38 U.S.C. § 7301, "at 1,250 health care facilities . . . serving 9 million enrolled Veterans each year."[4] And the Veterans Benefits Administration administers a number of nonmedical benefits programs for veterans, *see id*. § 7701, including disability compensation, life insurance, housing assistance, educational assistance, and vocational rehabilitation and

---

[2] VA, About VA, https://www.va.gov/about_va/mission.asp.

[3] VA, Industry Bests: How VA Stacks Up (Feb. 14, 2018), https://www.blogs.va.gov/VAntage/45343/industry-bests-how-va-stacks-up/.

[4] VA, Veterans Health Administration, https://www.va.gov/health/.

training, *see id.* §§ 1110, 1131, 1312, 1521, 2011, 3461, 3702, 3742, 4102. As the Supreme

Court has repeatedly recognized, "[t]he solicitude of Congress for veterans is of long standing."

*Henderson v. Shinseki*, 562 U.S. 428, 440 (2011) (quoting *United States v. Oregon*, 366 U.S.

643, 647 (1961)).

The approach of the Executive Branch of late is therefore notable. Notwithstanding the

VA's somber mission, the agency has authorized Ike Perlmutter, the CEO of Marvel

Entertainment, Bruce Moskowitz, a doctor in private practice in West Palm Beach, Florida, and

Marc Sherman, a consultant, to advise the agency, to shape its most important projects, and to

guide its policy development. First Am. Compl. ("FAC") ¶¶ 2, 30 (Dec. 6, 2018), ECF No. 10.

The VA has sought the advice and recommendations of Mr. Perlmutter, Mr. Moskowitz, and Mr.

Sherman not on account of their experience; they have none that is particularly relevant, either in

the government or in the U.S. military. Rather, the only nexus is that they happen to be members

of the Mar-a-Lago Club, President Trump's golf and social club in Palm Beach. *Id.* ¶ 31.

Together, Mr. Perlmutter, Mr. Moskowitz, and Mr. Sherman comprise a de facto federal

advisory committee established and utilized by the VA to provide advice and recommendations

to the agency. The three men came together in order to advise the VA between December 2016 –

January 2017. *Id.* ¶¶ 28-29, 36(a)-(b). The Council met for the first time after President Trump

took office in early February 2017, when Dr. David Shulkin, less than a month after his

nomination by the President to lead the VA and shortly before his confirmation by the Senate,

flew to Mar-a-Lago to meet with all three men. *Id.* ¶ 36(c).[5] The VA's establishment of the Mar-

---

[5] Plaintiff's complaint erroneously describes Dr. Shulkin as already having been confirmed when
he first met the Council at Mar-a-Lago around February 7, 2017. FAC ¶ 36(c). In fact, his
confirmation came a week later. *See* Lisa Rein, *Shulkin Unanimously Confirmed to Head
Veterans Affairs*, Wash. Post, Feb. 13, 2017, https://www.washingtonpost.com/politics/shulkin-
unanimously-confirmed-to-head-veterans-affairs-department/2017/02/13/b7da5ea8-f236-11e6-

a-Lago Council was thereby marked. *Id.* Following the meeting, under the subject line "Group

meeting," Mr. Moskowitz emailed Dr. Shulkin to outline the pace at which the Council would

update the Secretary and others at the VA on their recommendations and progress. Mr.

Moskowitz stated that they would "not need to meet in person monthly, . . . meet face to face

only when necessary," and hold "conference calls at a convenient time." *Id.* ¶ 36(d). Dr. Shulkin

responded to "echo Bruce's comments and in particular thank [the Council]." "I know how busy

all of you are," he continued, "and having you be there in person, and so present, was truly a

gift."[6]

The Council later described the origins and scope of their collective work on behalf of the

VA in a statement that is worth quoting at length:

### Statement by Ike Perlmutter, Bruce Moskowitz and Marc Sherman

The three of us come from very different backgrounds, but we have long shared a
deep concern for the health of our veterans. When we saw an opportunity to assist
the Department of Veterans Affairs's leadership in addressing some of the most
intractable problems of the VA, we considered it an honor and a privilege to do
so. After the President's election, we saw an opportunity to share our expertise in
organizational management and our personal relationships with healthcare experts
around the country to assist the VA as it undertook an aggressive reform of its
healthcare delivery and systems. *We offered our counsel, and the advice of these
healthcare experts, to assist the President, Secretary and VA leadership in their
making the essential decisions—sometimes life or death—that affect our nation's
veterans*. At all times, we offered our help and advice on a voluntary basis,
seeking nothing at all in return.

It was Mr. Perlmutter's personal relationship with the President that allowed us
the opportunity to be of service. *Since late 2016, we have shared our views and*

---

b9c9-e83fce42fb61_story.html?utm_term=.fb7c5ac2c7cb. The documents cited by the FAC,
however, indicate that during this time shortly prior to his confirmation Dr. Shulkin's schedule,
at least, was already being managed by VA officials. *See* FAC ¶¶ 36(c)-(d) & nn. 17-19 (and
materials cited therein).

[6] *The Mar-a-Lago Crowd Documents*, ProPublica, at DS-Moskowitz 1 Att 1-2_Redacted,
https://www.propublica.org/datastore/dataset/the-mar-a-lago-crowd-documents (cited in FAC
¶ 36(d) & n.18).

s-- placeholder

*perspectives on a number of occasions with VA leadership.* For the most part, those interactions were either to facilitate introductions to subject matter healthcare and technology experts with whom we had relationships, or to discuss healthcare delivery and healthcare quality challenges facing the agency and therefore affecting our veterans. While we were always willing to share our thoughts, we did not make or implement any type of policy, possess any authority over agency decisions, or direct government officials to take any actions. *That was not our role, and we were at all times very well aware of that. We provided our advice and suggestions so that members of the Administration could consider them as they wished to make their own decisions on actions to be taken.* To the extent anyone thought our role was anything other than that, we don't believe it was the result of anything we said or did.

At no time was our volunteer assistance a secret. *We were on emails and conference calls with senior staff, and Secretary Shulkin referred on numerous occasions to his discussions with outside experts.* He specifically mentioned one or more of us at public events covered by the media. We were also present at a post-meeting White House press gaggle on VA-related issues. We are proud of any contribution we have been able to make to improve the healthcare provided to the fine men and women who are served by the VA. None of us has gained any financial benefit from this volunteer effort, nor was that ever a consideration for us. The only benefit we gained was the satisfaction of helping America's veterans get the very best healthcare possible, in the most efficient and effective manner.

*Id.* ¶ 74(o) (emphasis added).[7]

Documents made available by the VA under the Freedom of Information Act confirm that the Council was not exaggerating its role in providing advice and recommendations to the agency. All in all, the documents show that the Council has held more than twenty-five meetings. *Id.* ¶ 36. Mr. Perlmutter, Mr. Moskowitz, and Mr. Sherman all participated in at least ten of them. *Id.* Sometimes, where one Council member was unable to attend, another Council member promised to fill him in after, meaning that at least some number of the meetings attended by

---

[7] Notwithstanding the instances cited by the Council where the VA publicly acknowledged its contributions, its claim that its "volunteer assistance" was never "a secret," FAC ¶ 74(o), is belied by documents showing that the VA took pains to "protect" the Council's conversations with top VA officials from disclosure, *id.* ¶ 36(dd) (then-Chief of Staff Peter O'Rourke emailing the Council after a meeting the prior day, stating that "as instructed by the Secretary last night," he would "not discuss the content [of the meeting] with any of the individuals that were mentioned").

fewer than all three Council members nevertheless evidence the Council's collective advisory purpose. *E.g.*, *id.* ¶ 36(f). These meetings frequently included high-level officials at the VA, including Secretary Shulkin, *e.g.*, *id.* ¶¶ 36(e)-(f), (h)-(k), (v)-(w), (dd); senior advisors to the Secretary, *e.g.*, *id.* ¶¶ 36(p)-(r); and other top agency officials, *e.g.*, *id.* ¶¶ 36(s)-(t) (Under Secretary for Health), ¶ 36(x) (various VA officials), ¶ 36(dd) (Chief of Staff and later acting Secretary Peter O'Rourke). When Robert Wilkie, named acting Secretary by the President in late March 2018, arrived for his first day at work at the VA, Mr. Sherman was waiting for him in his office. *Id.* ¶ 36(ff). Less than a month later, reprising Dr. Shulkin's early trip, acting Secretary Wilkie met with the Council at Mar-a-Lago. *Id.* ¶ 36(hh).

The policies, projects, and topics about which the Council has provided advice run the gamut, and include some of the VA's most important priorities. The Council advised Secretary Shulkin "for many months" (in the Council's own words) to privatize certain VA services. *Id.* ¶ 68; *see id.* ¶ 69 (Secretary Shulkin responded to one Council recommendation concerning privatization, saying, "I agree with Ike and the team"). The Council recommended that the VA organize a summit of experts on medical device registries. *See id.* ¶ 61. In preparation for the summit, Council members joined VA officials on more than a dozen weekly calls; at the summit itself, acting Secretary O'Rourke thanked Mr. Moskowitz for being one of the "driving forces" behind the initiative. *Id.*; *see id.* ¶¶ 62-63 (further describing the Council's involvement and noting that Mr. Moskowitz started a foundation, on whose board Mr. Perlmutter's wife served, that has lobbied healthcare institutions to start medical device registries). The Council also assisted the VA with an initiative concerning veteran suicide that culminated when Secretary Shulkin rang the closing bell at the New York Stock Exchange accompanied by Captain America and Spider-Man, two characters of Mr. Perlmutter's Marvel Entertainment. *Id.* ¶ 45; *see also id.*

¶ 72 (describing the Council's recommendations to the VA concerning an initiative around mental health).

In addition, the Council recommended that the VA work with Apple to develop a mobile application that would permit veterans to find nearby medical services and access health records. *Id.* ¶ 46; *see id.* ¶¶ 47-60.  The mobile application was to be based, in part, on an existing application built by Mr. Moskowitz. *Id.* ¶ 50. Mr. Moskowitz's son Aaron was brought on to advise the VA on the mobile application effort, and the VA described Aaron as a "mid-level . . . manager" of the project. *Id.* ¶ 59. The Council also played a significant role in the hiring and firing of key VA personnel. *See id.* ¶¶ 43-44, 73. Other examples of the Council's influence abound. *See, e.g.*, *id.* ¶¶70 (evaluation of VA surgery programs), ¶ 71 (tracking human tissue devices).

Perhaps most significantly, the Council provided substantial input on the VA's project to transform its digital records system, which ultimately led the VA to award a $10 billion contract to Cerner Corp. *Id.* ¶ 64. Secretary Shulkin specifically sought the Council's advice on the contract, including by flying to Mar-a-Lago for the purpose of meeting with the Council to "close the deal on" it. *Id.* ¶ 66. The VA's Chief Information Officer had Council members sign non-disclosure agreements in order to review the contract—agreements that the Council specifically modified to ensure that they would be able to consult with each other in providing recommendations to the agency. *Id.* ¶¶ 67, 74(j). Indeed, the Council led the process of revising the contract that was ultimately issued to Cerner, *id.* ¶ 67—"one of the largest IT contracts in the federal government."[8]

---

[8] Press Release, VA, VA Signs Contract with Cerner for an Electronic Health Record System (May 17, 2018), https://www.va.gov/opa/pressrel/pressrelease.cfm?id=4061.

Just as the Council itself has set forth its views about its advisory responsibilities, *see id.*
¶ 74(o) (Council statement), the VA has likewise acknowledged the Council's role in providing
advice and recommendations to the agency. Discussing a ten-year project to reform the VA's
digital records system, one Department official said, "We just had to make the Mar-a-Lago
[Council] comfortable with the deal. . . . They have someone's ear. Power and influence are
power and influence." A former Department official went further, saying "[e]verything needs to
be run by [the Mar-a-Lago Council]" because "[t]hey view themselves as making the decisions."
*Id.* ¶ 41. Darren Selnick, senior advisor to Secretary Shulkin and the Council's primary agency
point of contact on the mobile app project, *id.* ¶¶ 36(q), 47, referred to the Council—along with
Secretary Shulkin—as the project's "top principles," *id.* ¶ 51. And yet the VA at times reminded
the Council that agency officials remained in charge. *See id.* ¶ 56 (email from Mr. Selnick to Mr.
Moskowitz ensuring that the Council understood that it was "the *VA*['*s*] responsibility to provide
the overall . . . manage[ment] and [to] provide oversight for the VA/Apple/Ce[r]ner partnership,"
such that the Council's work on the mobile app would necessarily need to flow through the VA's
designated project leads (emphasis added)), ¶ 60 (email from Chief of Staff O'Rourke to the
Council addressing certain of the Council's frustrations with the mobile app project and asking
what he could "do to salvage [the] group's work and expertise").

Notwithstanding the steady stream of advice and recommendations that the Council,
acting as a group, *see, e.g.*, *id.* ¶¶ 74(a)-(o), has provided to the VA at the VA's behest, none of
the Council's meetings have been noticed in the Federal Register, there is no evidence that any
minutes of the meetings have been kept, and none of the material that the Council generated or
received has been disclosed by the VA under the FACA, *id.* ¶¶ 37, 76. Accordingly, Plaintiff
VoteVets—an organization dedicated to improving veterans policy, *see id.* ¶¶ 11, 77-79—seeks
disclosure of the Council's activities and sues to enforce the FACA's requirements. Defendants

have now moved to dismiss.[9] For the reasons stated below, Defendants' motion should be denied.

## ARGUMENT

In deciding Defendants' motion to dismiss, under either Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant [P]laintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted); *see, e.g.*, *Grell v. Trump*, 330 F. Supp. 3d 311, 315 (D.D.C. 2018). "[D]etailed factual allegations" are not necessary, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Thus, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, although Defendants' motion may be denied even if "recovery is very remote and unlikely," *id*. at 556. Plaintiff has satisfied this standard.

## I.      VoteVets Has Plausibly Alleged that the Mar-a-Lago Council Is an Advisory Committee Subject to the FACA

The narrow question before the Court at this stage of the litigation is whether Plaintiff's factual allegations, accepted as true, plausibly state a claim that the VA has established and utilized the Council to provide advice and recommendations to the agency. *Iqbal*, 556 U.S. at 678. They do. As Plaintiff alleges in detail, the VA has authorized Mr. Perlmutter, Mr. Moskowitz, and Mr. Sherman, acting collectively, to advise the agency on a broad swath of its most important projects and policies.

Because Plaintiff's allegations suffice, Defendants' motion to dismiss should be denied. Starting with the FACA's plain text, the Mar-a-Lago Council is an "advisory committee" within

---

[9] *See* Defs.' Mot. to Dismiss First Am. Compl. ("Defs.' Mot.") (Dec. 20, 2018), ECF No. 11.

the meaning of the statutory definition. 5 U.S.C. app. 2 § 3(2); *see Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1309 (D.C. Cir. 2004) ("our interpretation of [a law] begins with its text and the presumption that Congress 'says in a statute what it means and means in a statute what it says there'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). In addition, consideration of the D.C. Circuit's well-established "guideposts," *CREW v. Leavitt*, 577 F. Supp. 2d 427, 432 (D.D.C. 2008)—whether a particular group has, "in large measure, an organized structure, a fixed membership, and a specific purpose," *AAPS*, 997 F.2d at 914[10]—confirms that the VA has established and utilized the Mar-a-Lago Council as a de facto advisory committee.

### A.      VoteVets' Allegations Plausibly Establish that the Mar-a-Lago Council Is a Committee with a Fixed Membership

There can be no question that the Council is a "committee, board, commission, council, conference, panel, task force, or other similar group." 5 U.S.C. app. 2 § 3(2). Black's Law Dictionary defines "council," for example, as "[a] deliberative assembly; specif[ically], a group of people elected or chosen to make rules, laws, or decisions, or to give advice." Black's Law Dictionary (10th ed. 2014). That the Mar-a-Lago Council has served as a deliberative group has been evident since at least the Council's first meeting with Dr. Shulkin in early February 2017. Mr. Moskowitz's follow-up email, sent under the subject line "Group meeting," thanked the other Council members and Dr. Shulkin for their time, and laid plans, which ultimately came to fruition, for "face to face" meetings and "conference calls" moving forward in order to "transition from vision to reality" with respect to federal veterans policy. FAC ¶ 36(d). From the start, then, the Mar-a-Lago Council has been a committee with a "fixed membership," *AAPS*, 997 F.2d at 914, consisting of Mr. Perlmutter, Mr. Moskowitz, and Mr. Sherman.

---

[10] *See, e.g.*, *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 34 (D.D.C. 2011); *see also Nader v. Baroody*, 396 F. Supp. 1231, 1233-35 (D.D.C. 1975) (articulating similar factors).

In keeping with the statutory and dictionary definitions, the D.C. Circuit has emphasized that "a group is a FACA advisory committee when it is asked to render advice or recommendations, *as a group*, and not as a collection of individuals." *Id.* at 913. The Mar-a-Lago Council is such a group. The Council has understood itself as such from its inception, as discussed above. More recently, the Council's lengthy joint statement (quoted above) addressing its activities uses collective pronouns—*e.g.*, "we," "our"—without exception. *See* FAC ¶ 74(o). The Council's correspondence with the VA takes a similar tone. *See, e.g., id.* ¶ 70 (Mr. Sherman refers to the Council as "my gang"), ¶ 74(b) (Mr. Moskowitz refers to the Council as a "group"), ¶ 74(c) ("*we* are making very good progress"; "*we* are still very far away from achieving *our* goals" (emphasis added)), ¶ 74(g) (promise by Mr. Moskowitz to "discuss with everyone"), ¶ 74(k) (email from Mr. Moskowitz to acting Secretary Wilkie, saying "I am sure that I speak for the group"), ¶ 74(m) (email from Mr. Perlmutter to Secretary Wilkie, saying he wrote "for all of" the Council). In addition, the VA has also understood the Council as a committee, as epitomized by Secretary Shulkin's email stating his "agree[ment] with Ike and the team" on a particular issue, *id.* ¶ 74(d), and an email from Jake Leinenkugel, a White House senior advisor on veterans affairs, to a political appointee at the VA outlining "key items that need to be addressed within the VA Leadership structure" and instructing the VA to "[u]tilize outside team (Ike)," *id.* ¶ 73; in these emails, the VA refers to Mr. Perlmutter as "Ike", and to the Council as the "team." *See also id.* ¶ 74(h) (email from Mr. O'Rourke, then Chief of Staff, to the Council, promising to "protect our conversations from yesterday").

The Council's actions likewise reflect that Mr. Perlmutter, Mr. Moskowitz, and Mr. Sherman function as more than a collection of individuals. All three members of the Council are typically copied on correspondence with the VA. *See, e.g., id.* ¶¶ 36(d), 36(g)-(h), 36(k)-(l),

36(o), 36(q), 36(v), 36(w-x), 36(z), 36(dd) (and materials cited therein). Even based only on documents disclosed by the VA so far, it is apparent that Council members have taken pains to keep each other updated, so that their group advice derives from a common understanding of events and facts. *See id.* ¶ 74(a), 74(g).[11] Finally, and perhaps most tellingly, when the VA provided the Council with non-disclosure agreements to enable the Council to comply with the VA's request that the Council review the Cerner contract, the Council members—together— edited the agreements to ensure they could discuss the project with each other. *Id.* ¶¶ 67, 74(j). "The whole, in other words, [is] greater than the sum of the parts." *AAPS*, 997 F.2d at 914.

Defendants repeatedly claim that Plaintiff has not alleged that the Council operates by consensus. Defs.' Mot. 2, 18, 25. To the contrary, as summarized above, Plaintiff has detailed how the VA and the Council itself have understood the Council to be a deliberative body. But in any event, contrary to Defendants' assertion, it is plainly not Plaintiff's "burden to allege" that the Council has attempted "to achieve consensus on any specific policy matter." *Id*. at 18. As the D.C. Circuit has observed, while "many [advisory] committees are convened" with the "expectation" that they will "give[] consensus advice," "[o]thers . . . are established presumably with the full expectation that the positions to be taken and the advice to be offered may well be sharply divided." *AAPS*, 997 F.2d at 913. "And since one of the purposes of FACA is to achieve some balance, and thereby diverse views on advisory committees, *it would be passing strange* if FACA only applied to those committees that would offer consensus recommendations." *Id.*

---

[11] Defendants' view is "that a majority of the correspondence [cited in Plaintiff's complaint] involved only one or two of the [Council members]," not all three. Defs.' Mot. 20. Yet the documents disclosed thus far are only those that the government has released, and even they raise substantial questions about what additional meetings, correspondence, and internal interactions might be revealed by documents in the Council's possession. It makes sense, then, that courts assessing the legal sufficiency of claims under the FACA at the motion to dismiss stage have emphasized that the Federal Rules of Civil Procedure "do[] not require a plaintiff to plead in the complaint all facts that are needed to prove its claims." *Freedom Watch*, 807 F. Supp. 2d at 35.

(emphasis added). In light of this precedent, it is unsurprising that Defendants cite no caselaw supporting their assertion (at 20) that "brainstorming sessions" and "information-gathering calls" are strangers to the FACA.

**B.    VoteVets Has Plausibly Alleged that the VA Established the Mar-a-Lago Council**

The Council has been "established . . . by one or more agencies"—here, the VA—"in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." 5 U.S.C. app. 2 § 3(2). To be sure, President-elect Trump first tapped Mr. Perlmutter to lead the Council. FAC ¶ 29. But Mr. Perlmutter, Mr. Moskowitz, and Mr. Sherman quickly began operating as a team. *See, e.g.*, *id.* ¶ 36(a) (the Council convened a December 28, 2016 gathering among President-elect Trump and healthcare executives at Mar-a-Lago). The Council therefore has an "organized structure." *AAPS*, 997 F.2d at 914. And by early February 2017, after Dr. Shulkin's nomination to lead the VA and after offices at the VA began supporting and reporting to him, *see supra* note 5, the VA's establishment of the Council as an advisory committee was marked by Dr. Shulkin's meeting with the Council at Mar-a-Lago, FAC ¶ 36(c). In addition, the VA's establishment of the Council was confirmed countless times over the following months as VA officers and staff met and corresponded with the Council. *See, e.g.*, *id.* ¶ 36(g) (one-hour call between the Council and then-Secretary Shulkin on February 28, 2017), ¶ 36(h) (same, on March 3, 2017), 36(k) (same, on April 12, 2017), ¶ 36(q) (thirty-minute call between the Council and Mr. Selnick, senior advisor to Secretary Shulkin, on May 18, 2017).

Finally, the VA established the Council "in the interest of obtaining advice or recommendations" on specific projects and policies. 5 U.S.C. app. 2 § 3(2). To that end, the Council has provided input on VA programs concerning veteran suicide, FAC ¶ 45; technology

platforms, *id.* ¶¶ 46, 64; a medical device registry, *id.* ¶ 61; privatization, *id.* ¶ 68; and the VA's

surgery programs, *id.* ¶ 70, among other examples. These were not "general initiatives that might

be explored," as Defendants labor to characterize them, Defs.' Mot. 20; they were particular VA

projects and policies that, on the basis of the Council's advice and recommendations, moved

forward (or did not) in specific directions. *See generally* FAC ¶¶ 43-73 (describing the Council's

recommendations as to each of the above-listed projects in detail).

In any event, Defendants cite no precedent limiting the FACA's application to groups

that "advise on . . . specific policy matter[s]," Defs.' Mot. 20, and, more importantly, the

FACA's text betrays no such limitation either. Rather, as relevant here, D.C. Circuit caselaw

simply requires the group to have "a specific purpose," *AAPS*, 997 F.2d at 914, which the

Council has. Its purpose, in its own words, is "to assist the [VA's] leadership in addressing some

of the [agency's] most intractable problems," and to "offer[] [its] counsel . . . to assist the

President, Secretary and VA leadership in their making the essential decisions—sometimes life

or death—that affect our nation's veterans." FAC ¶ 74(o). For its part, the VA repeatedly sought

the Council's purported "expertise," *id.* ¶¶ 60, 67, and credited its "efforts" with "mov[ing] [the

agency] out of the Industrial Age," *id.* ¶ 74(n) (emphasis omitted). Indeed, the Council's and the

VA's own expressions of the Council's purpose bear an uncanny resemblance to the FACA's

definition of "advisory committee." *Compare* 5 U.S.C. app. 2 § 3(2) (encompassing groups

"established or utilized . . . in the interest of obtaining advice or recommendations for the

President or one or more agencies or officers of the Federal Government") *with, e.g.*, FAC

¶ 74(o) (jointly-issued Council statement asserting that the Council "provided . . . advice and

suggestions so that members of the Administration could consider them as they wished to make

their own decisions on actions to be taken").

Nonetheless, throughout the course of its dealings with the Council so far, the VA has tasked the Council with specific to-dos. For example, the VA invited the Council's input on how the VA's mobile app project related to its electronic health record modernization project. FAC ¶ 66. The VA's management of the Council is particularly evident in the latter project, where the VA had the Council sign non-disclosure agreements so it could comply with the VA's request that the Council review the Cerner contract. *Id.* ¶ 67. The VA's then-acting Chief Information Officer even proposed a call to "orient [the Council] to the contract and help focus [it] on the parts where [its] expertise [would] be most valuable." *Id.*

For all these reasons, Plaintiff has plausibly alleged that the Mar-a-Lago Council has been "actually formed by [the VA]." *Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999) (citing *Pub. Citizen*, 491 U.S. at 452). Defendants' arguments to the contrary miss the point. First, Defendants are incorrect in asserting (at 16-17) that Plaintiff's complaint contains only a "single paragraph related to the formation" of the Council, and that Plaintiff relies on "two news articles" as "support for its assertions" concerning the VA's establishment of the Council. To the contrary, after acknowledging the Council's origins in President-elect Trump's request of Mr. Perlmutter, FAC ¶ 29, Plaintiff alleges that the VA established the Council—comprised of Mr. Perlmutter, Mr. Moskowitz, and Mr. Sherman—when Dr. Shulkin met with the three men in early February 2017, *id.* ¶ 36(c).[12] The VA's establishment of the Council is confirmed by

---

[12] Defendants state that Plaintiff "relies [on a ProPublica article] for many of its factual allegations." Defs.' Mot. 10. Rather, Plaintiff has relied primarily on agency records disclosed by the VA under the Freedom of Information Act, although it has substantiated certain of its allegations with reference to public reporting. Defendants attach such articles to their motion, asserting that they "should be incorporated by reference because they were cited" in Plaintiff's complaint. *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 70 (D.D.C. 2016); *see* Defs.' Mot. 7 (citing *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004), for the proposition that "[t]he court may independently consider any materials incorporated by reference in the complaint that are integral to the plaintiff's claims"). While Plaintiff likewise invites the

subsequent meetings between VA officials and the men, *see generally id.* ¶ 36 and sub-

paragraphs (summarized above), and as evidenced not by press accounts but rather by pages

upon pages of correspondence, *see, e.g.*, *id.* ¶ 36 & nn. 17, 22-23, 26, 32.

More fundamentally, therefore, Plaintiff has not alleged that the Mar-a-Lago Council was

established "by one or more private parties," as Defendants contend (at 19). Rather, Plaintiff

alleges that the Council was established by the VA. Accordingly, the cases on which Defendants

rely, *see id.*, have no application here. For example, in *Food Chemical News v. Young* it was a

"private organization" that "proposed" the group in question "and alone selected its members,"

900 F.2d 328, 333 (D.C. Cir. 1990) (applied in *Byrd*, 174 F.3d at 246-47). Here, by contrast, it

was the VA that established the Council as comprised of Mr. Perlmutter, Mr. Moskowitz, and

Mr. Sherman. Similarly, in *Physicians Committee for Responsible Medicine v. Horinko*, the

plaintiff "offered no evidence to indicate that [the agency] was responsible for initiating the

meetings between" the agency and the group in question. 285 F. Supp. 2d 430, 445-46 (S.D.N.Y.

2003). Here, by contrast, notwithstanding that Plaintiff has not yet had *any* opportunity to adduce

or offer evidence in this case, Plaintiff has plausibly alleged that the VA solicited the Council's

views and engagement. *See, e.g.*, FAC ¶ 41 (VA official stating, "[w]e just had to make the Mar-

a-Lago [Council] comfortable with [a project]"), ¶ 48 (VA official initiating a "conference call"

with the Council and others "to discuss the path forward" on a project), ¶ 51 (VA official telling

---

Court "to independently examine the documents and form its own conclusions," Defs.' Mot. 7
(citation and alterations omitted), because the articles in question "were merely cited as the
source of certain factual allegations within the [c]omplaint," the articles "are not 'integral' to
Plaintiff['s] claims," *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d at 71 ("Rule
10(c) does not require a plaintiff to adopt every word in a cited document as true for pleading
purposes"). Most importantly, to the extent Defendants reference the articles in an effort to raise
questions about the complaint's factual allegations, that would only be proper at "summary
judgment, rather than" in adjudicating Defendants' "motion to dismiss[,] when the Court is
tasked with accepting all factual allegations in the [c]omplaint as true." *Id.* at 72.

the Council that "you . . . are so important to help the VA move forward"), ¶¶ 66-67 (Secretary Shulkin flew to Mar-a-Lago to meet with the Council in order to "close the deal on the Cerner contract," and a VA official asked Council members to sign non-disclosure agreements so they could review the contract).

It is true, of course, that while "the FACA's definition of an advisory committee covers many groups, it does not extend to 'every formal and informal consultation between [an agency] and a group rendering advice.'" *Freedom Watch*, 807 F. Supp. 2d at 34 (quoting *Pub. Citizen*, 491 U.S. at 453) (alteration omitted). Thus, "'an important factor in determining the presence of an advisory committee is the formality and structure of the group.'" *Id.* (quoting *AAPS*, 997 F.2d at 913-14) (alterations omitted). The D.C. Circuit has instructed courts "examin[ing] a particular group or committee to determine whether FACA applies" to "bear in mind that a range of variations exist in terms of the purpose, structure, and personnel of the group":

> Perhaps it is best characterized as a continuum. At one end one can visualize a formal group of a limited number of private citizens who are brought together to give publicized advice as a group. That model would seem covered by the statute regardless of other fortuities such as whether the members are called "consultants." At the other end of the continuum is an unstructured arrangement in which the government seeks advice from what is only a collection of individuals who do not significantly interact with each other. That model, we think, does not trigger FACA.

*AAPS*, 997 F.2d at 915. Plaintiff's allegations plausibly show that the Mar-a-Lago Council falls on the former end of the continuum, triggering the FACA. According to the Council's and the VA's words and actions, the Council is a "formal group" comprised "of a limited number of private citizens"—Mr. Perlmutter, Mr. Moskowitz, and Mr. Sherman—"who are brought together to give . . . advice as a group," and who do "significantly interact with each other." *Id.*

Caselaw confirms the point. For example, in *Center for Biological Diversity v. Tidwell*, the court concluded that the plaintiff had "plausibly allege[d]" the existence of a de facto federal advisory committee where the complaint pleaded that the committee "was convened by . . . a

federal agency; . . . included non-federal employees as members; and was tasked with providing advice to the [agency] regarding" a certain topic. 239 F. Supp. 3d 213, 228 (D.D.C. 2017); *see also Nw. Forest Res. Council v. Espy*, 846 F. Supp. 1009, 1012 (D.D.C. 1994) (finding a de facto advisory committee where the group in question was "a consultative assembly of knowledgeable persons [brought together] for a specific purpose" that "was both 'established' and 'utilized' by the President for his guidance in devising . . . a policy," and where it did in fact "render him 'advice' and 'recommendations' which he accepted and followed").[13]

As this Court has observed, "[e]xamination of the [FACA] as a whole . . . points to the conclusion that Congress was concerned with advisory committees formally organized which the President or an executive department or official directed to make recommendations on an identified governmental policy for which specified advice was being sought." *Nader*, 396 F. Supp. at 1234. That is precisely what Plaintiff has alleged. Plaintiff's factual allegations do not paint a picture of merely "casual, informal contacts by" agency staff "with interested segments of the population," of "unsolicited views" provided by a number of individuals, or of a "sounding board to test the pulse of the country." *Id.* To the contrary, the Mar-a-Lago Council was established by the VA to work as a group in providing advice and recommendations to the agency.

---

[13] The cases on which Defendants rely (at 18) are inapposite. Here, unlike in *Washington Toxics Coalition v. EPA*, Plaintiff *has* "alleged facts [and] pointed to evidence to substantiate" its claim that the VA established the Council. 357 F. Supp. 2d 1266, 1273 (W.D. Wash. 2004); *see* FAC ¶¶ 29, 36(c); *see also id.* ¶ 36 and sub-paragraphs. Similarly, here, unlike in *Freedom Watch, Inc. v. Obama*—which in any event was the decision on summary judgment, not a motion to dismiss—Plaintiff *has* alleged with specificity that the VA did much more than "solicit[] individual views" of the Mar-a-Lago Council members, and as discussed above, did ask the Council to "provide advice or recommendations as a group." 930 F. Supp. 2d 98, 102 (D.D.C. 2013), *aff'd*, 559 F. App'x 1 (D.C. Cir. 2014); *see, e.g.*, FAC ¶¶ 66-67. And unlike in *In re Cheney* (which likewise was not decided on a motion to dismiss), where the group in question was "a committee in the Executive Office of the President" such that "severe separation-of-powers problems" were at issue, 406 F.3d 723, 728 (D.C. Cir. 2005), in this case the Mar-a-Lago Council has been established and utilized by an executive agency, presenting no such problems.

**C.      VoteVets Has Plausibly Alleged that the VA Has Utilized the Mar-a-Lago Council**

Although being "established" by the VA suffices to trigger the FACA's requirements, the Council has also been "utilized by" the VA "in the interest of obtaining advice or recommendations" for the agency. 5 U.S.C. app. 2 § 3(2) (the FACA applies where a committee is "established *or* utilized" (emphasis added)). The D.C. Circuit has held that, whereas the "established" prong of the advisory committee definition applies to "a Government-formed advisory committee," the "utilized" prong "encompasses a group organized by a nongovernmental entity but nonetheless so closely tied to an agency as to be amenable to strict management by agency officials." *Byrd*, 174 F.3d at 246 (citations omitted). Even if Plaintiff's allegations did not suffice under the established prong—they do, as demonstrated above—the VA has developed "close[] tie[s]" to the Council and the Council has shown itself "amenable to strict management by" VA officers and staff. *Id.*

The Council's tight bonds with the VA are evident in the quantity and quality of interactions between the two. Defendants are correct in one respect, at least: accounting for those interactions requires "a laundry list," Defs.' Mot. 19—a long list indeed. Publicly available documents reveal that the Council and Council members have met and corresponded with leaders and staff at the VA dozens of times. *See* FAC ¶ 36 (summarizing known meetings between the Council and the VA); *see, e.g.*, *id.* ¶¶ 46-60 (detailing emails and meetings between the Council and the VA concerning the development of a mobile app), ¶ 61 (Council members joined VA officials on more than a dozen weekly conference calls to discuss organizing a summit around a medical device registry), ¶ 68 (email stating that the Council had "been talking to Dr. Shulkin for many months about" privatizing certain VA services). Public reporting summarizes as follows: the Council "[s]poke with VA officials daily." *Id.* ¶ 40.

20

Interactions like these—and so many others—cannot fairly be characterized, as Defendants would have it, as "unstructured and informal correspondence," Defs.' Mot. 2, or "informal encounters," *id.* at 20. What is "unstructured" about regular, even daily correspondence, and what is not "formal" about the "meetings" described by Plaintiff? *Id.* Defendants do not say. More to the point, while *AAPS* speaks to the importance of a *group* having a certain "formality" and an "organized structure," 997 F.2d at 913-14, it imparts no such requirement as to the group's *correspondence* and *meetings*. In any event, as a review of Plaintiff's allegations reveals and as even Defendants' own summary confirms, *see* Defs.' Mot. 20, contact between the Council and the VA has been extensive and substantive.

As to whether the Council is "amenable to strict management by" the VA, *Byrd*, 174 F.3d at 246, while the Council's influence has been substantial, *see, e.g.*, FAC ¶¶ 40-41—so much so that one former VA official said that Council members "view themselves as making the decisions," *id.* ¶ 41—the VA's and (in particular) the Council's official view is that the VA is in charge. The Council views itself as having "*assist*[*ed*] the [VA's] leadership in addressing some of the most intractable problems" at the agency. *Id.* ¶ 74(o) (emphasis added); *see id.* ("we saw an opportunity . . . *to assist* the VA as it undertook an aggressive reform of its healthcare delivery and systems" (emphasis added)). The Council has stressed that it has not "direct[ed] government officials to take any actions" and does "not . . . possess any authority over agency decisions." *Id.* "That was not our role," the Council has said, "*and we were at all times very well aware of that*." *Id.* (emphasis added). Documents disclosed thus far accordingly show the VA asserting its authority over the Council. *See id.* ¶ 56 (Mr. Selnick affirming "the *VA*[*'s*] . . . overall responsibility" to manage a particular project and instructing the Council to provide its

recommendations through proper VA channels (emphasis added));[14] *see also id.* ¶ 60 (VA official addresses the Council's concerns and asserts that he is empowered to "salvage" the Council's work). More importantly, as detailed above, the VA has specifically asked the Council for its advice on certain projects and identified certain tasks for it to undertake. *See, e.g.*, *id.* ¶¶ 66-67 (concerning the VA's electronic health record modernization project). These types of interactions, and the kinds of statements recounted above, signify "something along the lines of actual management or control" by the VA over the Council, confirming that the VA has "utilized" the Council within the meaning of the FACA. *Wash. Legal Found. v. U.S. Sent'g Comm'n*, 17 F.3d 1446, 1450 (D.C. Cir. 1994).

## II.    VoteVets Has Informational Standing

As Defendants effectively concede, VoteVets has plausibly alleged informational standing.[15] First, Plaintiff has "been deprived of information that, on its interpretation, [the FACA] requires the government . . . to disclose." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (citing *FEC v. Akins*, 524 U.S. 11, 21-22 (1998)). The FACA requires the VA to notice meetings of the Mar-a-Lago Council in the Federal Register, open those meetings to the public, and disclose minutes from those meetings and any materials prepared for or by the Council. 5 U.S.C. app. 2 §§ 10(a), (b). Defendants have not complied with these requirements,

---

[14] Read in context, the import of Mr. Selnick's reminder becomes even more clear. The full exchange documents Mr. Selnick ensuring that the Council, represented by Mr. Moskowitz, understands that Mr. Selnick exercises "overall responsibility to manage and provide oversight" on the mobile app project with Apple; thus, his inclusion on emails where the project was discussed was critical to his continuing to exercise that oversight authority. *See* FAC ¶ 56 & nn.92-93 (and materials cited therein). Contrary to Defendants' assertion (at 23), management of the partnership with Apple necessarily included management of the Council's activities with respect to that project. The exchange between Mr. Selnick and Mr. Moskowitz thus illustrates how the VA sought to oversee the Council's activities.

[15] Defendants' arguments concerning organizational and procedural injuries, Defs.' Mot. 8-12, are beside the point. Plaintiff has not pleaded either theory. *See* FAC ¶ 79.

*see* FAC ¶¶ 37, 76, and they have not argued to the contrary. Second, "by being denied access to [the] information" that the FACA requires Defendants to disclose, Plaintiff has experienced "the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals*, 828 F.3d at 992 (citing *Akins*, 524 U.S. at 21-22). Once again, Defendants cede the point. They do not contest that VoteVets' mission to advocate for America's veterans grounds its strong interest in monitoring the Council's activities. *See* FAC ¶¶ 77-79.

No more is required. *See Friends of Animals*, 828 F.3d at 992. Defendants disagree, urging this Court (at 13) to impose an additional requirement: that in order to assert informational standing under the FACA, a plaintiff must allege having requested, and having been denied, disclosure of committee records by the relevant agency. But Congress has imposed no such requirement in the FACA, and "a plaintiff seeking to demonstrate that it has informational standing generally 'need not allege any additional harm beyond the one Congress has identified.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)). Moreover, the Supreme Court has already identified the test for assessing informational standing under statutes, like the FACA, that require disclosure "even in the absence of a particular request." *Cummock v. Gore*, 180 F.3d 282, 289 (D.C. Cir. 1999). In *Akins*, the Court held that an injury is sufficiently "concrete and particular" where "[t]here is no reason to doubt [a plaintiff's] claim that the information would help them (and others to whom they would communicate it)." 524 U.S. at 21. Such is the case here.[16]

---

[16] Contrary to Defendants' argument (at 13), *Public Citizen* is consistent with *Akins*. In *Public Citizen*, the Court found that requests for information were "sufficient[]" to demonstrate a concrete and particularized injury, not that such requests were necessary. 491 U.S. at 449. The Court was clear that the locus of the plaintiff's injury was not its request for information, but its bona fide interest in "scrutiniz[ing] and "monitor[ing] [the advisory committee's] workings[,] and participat[ing] more effectively" in committee business. *Id.*

Nonetheless, to the extent there is any doubt, Plaintiff requested that the VA disclose Mar-a-Lago Council materials under the FACA. FAC ¶ 77. By letter dated November 29, 2018, the VA denied Plaintiff's request. *See* Ex. A at 1. For reasons unknown to Plaintiff, the VA's November 29, 2018 letter was only mailed on December 21, 2018, after Plaintiff filed its

Defendants' response to Plaintiff's assertion of informational standing boils down to the argument that, because Defendants do not view the Mar-a-Lago Council as an advisory committee subject to the FACA's requirements, their failure to disclose Council materials has not caused Plaintiff any cognizable injury. *See* Defs.' Mot. 13-14. Defendants' argument is unavailing. As Defendants themselves seem to acknowledge, *see id.*, this Court must "assume . . . at the pleading stage, that for purposes of standing the Council . . . [is], as alleged, [an] 'advisory committee[]' within the meaning of FACA," *Jud. Watch, Inc. v. U.S. Dep't of Commerce*, 583 F.3d 871, 873 (D.C. Cir. 2009).

Yet in this case, the Court need not rely on any such assumption. As demonstrated above, Plaintiff's factual allegations "allow[] the [C]ourt to draw the reasonable inference," *Iqbal*, 556 U.S. at 678, that the VA has established and utilized the Council to advise the agency. Plaintiff has thus plausibly alleged that the Council is an advisory committee subject to the FACA and that Defendants' refusal to comply with the Act has injured Plaintiff. Plaintiff's "right to relief" is "above the speculative level." *Twombly*, 550 U.S. at 555.

## CONCLUSION

Accordingly, the Court should deny Defendants' motion to dismiss.

Dated:   January 17, 2019

Respectfully submitted,

/s/ *Adam Grogg*
Adam Grogg (D.C. Bar No. 1552438)
Karianne M. Jones (D.C. Bar No. 187783)
Javier M. Guzman (D.C. Bar No. 462679)
Democracy Forward Foundation
1333 H St. NW
Washington, DC  20005
(202) 448-9090
agrogg@democracyforward.org
kjones@democracyforward.org

---

amended complaint on December 6, 2018, and after Defendants filed their motion to dismiss on December 20, 2018. *See id.* at 2. Perhaps that curious sequence explains Defendants' erroneous assertion that "the VA has not actually denied [Plaintiff's] request." Defs.' Mot. 13.

jguzman@democracyforward.org

*Counsel for Plaintiff*