**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VOTEVETS ACTION FUND, | |
| Plaintiff, | |
| v. | Case No. 18-1925 (TJK) |
| UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, *et al.*, | |
| Defendants. | |

**DEFENDANTS' REPLY IN SUPPORT OF
<u>MOTION TO DISMISS FIRST AMENDED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

   I.     The FAC Does Not Plausibly Suggest that the VA "Established" a FACA Committee. .............................................................................................................. 2

   II.    The FAC Does Not Plausibly Suggest that the VA Strictly Managed or Controlled the Three Individuals. ................................................................... 11

   III.   The FAC Does Not Plausibly Suggest that the Three Individuals Operated as a "Council" or Similar Group. ........................................................................ 15

         A.    The FAC Does Not Plausibly Allege the Existence of a Council with a Fixed Membership and Organized Structure. .......................................... 15

         B.    The FAC Does Not Plausibly Allege that the "Whole" of the Three Individuals Was Greater than the Sum of its Parts. .................................... 17

         C.    The FAC Does Not Plausibly Allege that the Three Individuals Had a Specific VA-Bestowed Purpose. ................................................................. 19

   IV.    VoteVets Lacks Standing. ................................................................................. 20

CONCLUSION ................................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
   997 F.2d 898 (D.C. Cir. 1993) ........................................................................ passim

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................... 6, 7, 11

*Byrd v. EPA*,
   174 F.3d 239 (D.C. Cir. 1999) ...................................................................... passim

*Center for Biological Diversity v. Tidwell*,
   239 F. Supp. 3d 213 (D.D.C. 2017) ...................................................................... 9

*Citizens for Responsibility and Ethics in Washington v. Leavitt*,
   577 F. Supp. 2d 427 (D.D.C. 2008) ................................................................ 10, 11

*Claybrook v. Slater*,
   111 F.3d 904 (D.C. Cir. 1997) ............................................................................ 21

*Food & Water Watch v. Trump*,
   No. 17-1485-ESH, 2018 WL 6448634 (D.D.C. Dec. 10, 2018) ...................... 18, 21

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) ............................................................................ 20

*Huron Envtl. Activist League v. EPA*,
   917 F. Supp. 34 (D.D.C. 1996) ............................................................................ 18

*In re Cheney*,
   406 F.3d 723 (D.C. Cir. 2005) ................................................................. 11, 17, 20

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) ........................................................................ 7

*Judicial Watch, Inc. v. Dep't of Commerce*,
   583 F.3d 871 (D.C. Cir. 2009) ........................................................................ 21, 22

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
   736 F. Supp. 2d 24 (D.D.C. 2010) ...................................................................... 22

*Judicial Watch, v. Dep't of Commerce*,
   No. 08-5490, 2009 WL 1643334 (D.C. Cir. Apr. 29, 2009) .............................. 21

*Nader v. Baroody*,
   396 F. Supp. 1231 (D.D.C. 1975) ........................................................................ 18

*Northwest Forest Resource Council v. Espy*,
  846 F. Supp. 1009 (D.D.C. 1994) .................................................................... 10

*Public Citizen v. Dep't of Justice*,
  491 U.S. 440 (1989) .......................................................................... passim

*United States v. Nixon*,
  418 U.S. 683 (1974) .................................................................... 20, 21

*Washington Legal Foundation v. U.S. Sentencing Commission,*
  17 F.3d 1446 (D.C. Cir. 1994) ...............................................6, 11, 12

*Wuterich v. Murtha*,
  562 F.3d 375 (D.C. Cir. 2009) ...............................................................11

## **Statutes**

5 U.S.C. app. 2 § 3(2) ......................................................................... 15

## **Regulations**

41 C.F.R. 102-3.40(e) .......................................................................... 16

41 C.F.R. 102-3.160 ...........................................................................19

## **Other Authorities**

Black's Law Dictionary (10th ed. 2014) ....................................................15

Dep't of Veteran Affairs, Advisory Committee Management Guide (2017),
  https://www.va.gov/ADVISORY/docs/ACMO-2017ACMOGuidesignedbyCoSVA.pdf.........6

Dep't of Veterans Affairs, Office of Privacy and Records Management,
  https://www.oprm.va.gov/docs/foia/CalendarsDJSwBMIPMSRedacted.PDF...................5, 16

Dep't of Veterans Affairs, Office of Privacy and Records Management,
  https://www.oprm.va.gov/docs/foia/DSTBCSto62218Redacted.PDF..........................13

Dep't of Veterans Affairs, Office of Privacy and Records Management,
  https://www.oprm.va.gov/docs/foia/EmailsJHBto622181Redacted.PDF..............................16

Dep't of Veterans Affairs, Office of Privacy and Records Management,
  https://www.oprm.va.gov/docs/foia/EmailsPORto62218Redacted.PDF.................8, 16, 17, 18

Oxford University Press, Oxford Living (English) Dictionary,
  https://en.oxforddictionaries.com/definition/us/form..............................................3

VA Electronic Health Modernization, Request for Proposal, Interoperability Review Report,
  MITRE (Jan. 2018),

https://www.oprm.va.gov/docs/foia/VAEHRMInteroperabilityReviewReportJan2018%20FINALRedacted.PDF.......................................................................................................................8

## INTRODUCTION

The opposition brief filed by Plaintiff ("VoteVets") confirms that its claims are foreclosed by thirty years of binding precedent under the Federal Advisory Committee Act ("FACA"). VoteVets sums up its legal theory as follows: the VA's alleged "reliance on [the Three Individuals] triggers the Act's obligations."  Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") at 1, ECF No. 13.  That theory is precisely the one rejected by *Public Citizen v. Dep't of Justice*, 491 U.S. 440 (1989).  Indeed, by VoteVets' own concession, FACA is not implicated unless either (1) an agency actually "'*create[s]* an advisory group,'" or (2) an advisory group created otherwise is "'amenable to . . . *strict management* by agency officials.'"  Pl.'s Opp'n at 2.

VoteVets fails to demonstrate that its allegations plausibly satisfy that legal standard.  Its suggestion that the VA "established" a FACA committee simply by meeting with the Three Individuals, Pl.'s Opp'n at 14, is a theory of constructive formation conclusively foreclosed by binding precedent; the D.C. Circuit has repeatedly held that an agency does not "establish" an advisory committee unless it "actually forms" that committee.  Nor does VoteVets muster a single fact suggesting that the Three Individuals are amenable to "strict management" by VA officials; quite the opposite.  Its allegations paint a picture of three men operating autonomously and according to their own prerogatives, so much so that, according to VoteVets, a former VA official opined that the men "view *themselves* as making [agency] decisions."  First Am. Compl. ("FAC") ¶ 41, ECF No. 10.  Unable to dispute this, VoteVet resorts to legally insufficient assertions that the men "assisted" the VA and that the VA "asked [them] for" or purportedly "authorized" them to provide advice, none of which suggest that the VA strictly managed them.  And, independently fatal to its claims, VoteVets has not shown that the Three Individuals—who by all appearances, corresponded with VA officials only in an ad hoc and informal manner, did not meet or deliberate

among themselves, were not guided by any specific objectives or work plans assigned by the VA, had no committee or group title, and possessed no budget, voting rules, or quorum requirements—amount to a deliberative body that could possibly implicate FACA.   Finally, because VoteVets has not plausibly alleged the existence of a committee that could trigger FACA's disclosure obligations, VoteVets also cannot demonstrate informational standing.   The case should be dismissed.

## ARGUMENT

The legal standard that this Court must apply is "narrow" and undisputed:  to state a claim under FACA, VoteVets must plausibly allege—with *facts*, not conclusions—either that the VA "actually formed" a FACA committee composed of the Three Individuals or that the Three Individuals are "amenable to strict management by [VA] officials."  *Byrd v. EPA*, 174 F.3d 239, 245 (D.C. Cir. 1999) (citations and ellipses omitted); Pl.'s Opp'n at 2.[1]   VoteVets also must demonstrate that the Three Individuals acted *as a committee*, namely, with the requisite "formality and structure" of a deliberative body that possessed "an organized structure, a fixed membership, and a specific purpose."  *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton* ("*AAPS*"), 997 F.2d 898, 914 (D.C. Cir. 1993); Pl.'s Opp'n at 2.  VoteVets has done none of these things.

## I.        The FAC Does Not Plausibly Suggest that the VA "Established" a FACA Committee.

VoteVets' theory that the VA "established" a FACA committee is as follows: (1) In December 2016, Mr. Perlmutter was "tapped" by then President-elect Trump; (2) "Mr. Perlmutter, Mr. Moskowitz, and Mr. Sherman quickly began operating as a team" (apparently of their own

---

[1] VoteVets' suggestion that the Court should refer to FACA's "plain text," Pl.'s Opp'n at 10, is therefore mistaken. *See, e.g.*, *Public Citizen*, 491 U.S. at 453 ("Nor can Congress have meant . . . a straightforward reading of 'utilize'"); *id.* at 463-64 ("A literalistic reading . . . would catch far more groups and consulting arrangements than Congress could conceivably have intended.").

accord); (3) in February 2017, then-Undersecretary David Shulkin met with the Three Individuals; and (4) "The VA's establishment of the [Three Individuals] as an advisory committee was [thereby] marked[.]"  Pl.'s Opp'n at 14 (citing FAC ¶ 36(c))[2]; *see also id.* at 4-5 ("The three men came together . . . between December 2016-January 2017"; "met for the first time [with Dr. Shulkin] . . . in early February 2017"; and the "VA's establishment of the Mar-a-Lago Council was thereby marked").  Thus, VoteVets' theory is that the VA established the Council merely by Dr. Shulkin meeting with the Three Individuals.  VoteVets further states that the VA's purported "establishment of the Council" was "confirmed" when VA officials subsequently participated in telephone discussions with, among other people, the Three Individuals.  *Id.* at 16-17 (citing FAC ¶¶ 36(g), (h), (k), (q)).  This theory—that VA officials could passively transform three private individuals into a FACA committee simply by meeting and corresponding with them—cannot be squared with controlling law.

The D.C. Circuit has repeatedly held that "an agency 'establishes' a committee only if the agency forms the committee[.]"  *Byrd*, 174 F.3d at 246.  "Form" means, *inter alia*, to "[b]ring together parts or combine to create," to "[o]rganize people or things into (a group or body)," or to "[m]ake or fashion into a certain shape or form."[3]  Thus, to state a claim that the VA formed a FACA committee, VoteVets must, at a minimum, allege facts showing that the VA conceived of the

---

[2] Paragraph 36(c) of the FAC says that, on or around February 7, 2017, the "Council met in person for the first time since President Trump took office," and that then-Undersecretary David Shulkin "flew to Mar-a-Lago for the meeting with the Council, marking the VA's establishment of the Council."

[3] Oxford   University   Press,   Oxford   Living   (English)   Dictionary, https://en.oxforddictionaries.com/definition/us/form (last visited Feb. 21, 2019).

need for such an advisory committee, specified its function, and chose its members. *See Byrd*, 174 F.3d at 246-47.

Nothing in the FAC or VoteVets' opposition brief plausibly suggests that is what occurred. VoteVets does not contend that the VA appointed, chose, or otherwise brought together the Three Individuals to deliberate and provide advice to the agency, much less assigned them an overarching advisory function.   Nor does VoteVets allege that the VA took any other action that might be relevant to the formation of a committee, such as, for example, establishing the group's working objectives, providing a budget or resources to aid the group's work, naming officers, establishing voting or quorum requirements, assigning the preparation of a report or final decision, or providing any structure whatsoever on the manner in which the Three Individuals deliberated, reached decisions, or conveyed their opinions to the VA.   Instead, VoteVets simply alleges that the Three Individuals "began operating as a team," apparently of their own accord, and thereafter VA officials met with them on several occasions and occasionally asked for their input.   Pl.'s Opp'n at 14; FAC ¶¶ 29, 36(a).   Such actions cannot possibly be construed as "actually form[ing]" a FACA committee.   *Byrd*, 174 F.3d at 245.

In fact, the FAC does not even allege that Dr. Shulkin (or any other VA official) "established" a FACA committee; rather it alleges that Dr. Shulkin met with the Three Individuals and thereby "*mark[ed]* the VA's establishment" of the purported Council.   FAC ¶ 36(c).   The FAC therefore appears to suggest that, rather than selecting the Three Individuals for inclusion in a specific advisory body, the VA somehow put its imprimatur on the Three Individuals by meeting with them.   Plaintiffs' opposition brief, at 4-5 & 14, reflects a similar theory.   That theory is just as passive as the allegation presented in VoteVets' original complaint, which failed to connect the purported establishment of the "Mar-a-Lago Council" to the VA at all.   *See* Compl. ¶ 27, ECF No.

4

1 ("In January 2017, the Mar-a-Lago Council was established[.]").  It therefore cannot be squared with *Byrd,* which holds that an agency must "actually form[]" an advisory committee, 174 F.3d at 245.  Meeting with, or "mark[ing] the establishment of," a group is not enough.

VoteVets also relies on an email sent by Dr. Moskowitz after the alleged February 7 meeting at Mar-a-Lago in which he purportedly "outline[d] the pace at which the Council would update . . . the VA on their recommendations and progress," Pl.'s Opp'n at 5, but it too fails to plausibly suggest that the VA established a FACA committee.  First, the email says nothing about a purported "Council," much less "updat[ing] . . . the VA on" any "recommendations and progress."  Rather, the email states:

> "I would like to thank everyone for their dedication and very important insight so that we can transition from vision to reality.  We do not need to meet in person monthly, but meet face to face only when necessary to respect everyone's valuable time.  We will set up phone conference calls at a convenient time."

To which Dr. Shulkin responded:

> "I would like to echo Bruce's comments and in particular thank him, Ike, and [redacted.]  I know how busy all of you are and having you be there in person, and so present, was truly a gift.  I found the time that we spent, the focus that came out of our discussions, and the time we had with the President very meaningful.  I think we all believe that we can and need to provide better care to our veterans and I am grateful for your involvement."[4]

To the extent VoteVets believes that Dr. Moskowitz's statements about "transition[ing] from vision to reality" through follow-up conference calls, indicates that the *VA* created a FACA committee, it is wrong.  The statements are those of Dr. Moskowitz, not the VA, and they simply reflect the fact that *Dr. Moskowitz* had goals on which he intended to follow up.  Dr. Shulkin, in contrast, merely expressed that he found the time spent with the men to be a "gift" and that he was

---

[4]   Dep't of Veterans Affairs, Office of Privacy and Records Management, https://www.oprm.va.gov/docs/foia/CalendarsDJSwBMIPMSRedacted.PDF (last visited Feb. 21, 2019) at 3.

"grateful" for Dr. Moskowitz and Mr. Perlmutter's involvement.  Such platitudes demonstrate no action by Dr. Shulkin at all, much less the VA generally, and they are therefore insufficient to suggest that the VA "actually formed" an advisory committee at the February 7 meeting.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (plaintiff must allege facts "plausibly suggesting (not merely consistent with)" its theory of illegality).  Indeed, Dr, Shulkin had not yet been confirmed or sworn in as Secretary when he met with the Three Individuals in early February 2017, as VoteVets acknowledges.  Pl.'s Opp'n at 4 n.5.  Consequently, among the many other flaws with this theory, Dr. Shulkin—in his capacity as Undersecretary—did not have the authority to establish a FACA advisory committee at that time.  *See* Dep't of Veterans Affairs, Advisory Committee Management Guide (2017), at 9 ("Federal advisory committees . . . may not be established unless . . . specifically authorized by statute, by the President, or by the Secretary of Veterans Affairs").[5]

VoteVets' assertion that "the VA's establishment of the Council is confirmed by . . . meetings between VA officials and the men," Pl.'s Opp'n at 16-17, is similarly insufficient.  As the VA has shown, agencies do not form FACA committees simply by meeting with a group of people; indeed, that is true even if agency officials are members of the group, which is not alleged here.  *See* Defs.' Mem. of Law In Supp. of Mot. to Dismiss ("Defs. Mot.") at 15-16, ECF No. 11-1.  Thus, in *Byrd*, the D.C. Circuit easily concluded on the pleadings that the advisory panel at issue was not a FACA committee notwithstanding the fact that "several EPA employees . . . attended . . . meeting[s] and . . . participated" in the panel.  174 F.3d at 242.  Similarly, in *Washington Legal Foundation v. U.S. Sentencing Commission*, the D.C. Circuit held that the United States Sentencing Commission is not a FACA committee even though agency officials were members of the

---

[5]   https://www.va.gov/ADVISORY/docs/ACMO-2017ACMOGuidesignedbyCoSVA.pdf   (last visited Feb. 21, 2019).

Commission, participated in its deliberations, and allegedly "played an important role in the Group's decisionmaking." 17 F.3d 1446, 1450 (D.C. Cir. 1994) ("FACA requires more than WLF has alleged").

VoteVets also invokes paragraph 29 of the FAC, Pl.'s Opp'n at 16 , but that paragraph does not plausibly suggest that the VA established a "Mar-a-Lago Council" either.   It says that "*President Trump* named Isaac 'Ike' Perlmutter to lead the Council, and Bruce Moskowitz and Marc Sherman to serve on the Council" (emphasis added).   Not only does this lack the requisite action by the *VA*, the news article cited for this this assertion does not support it. Rather, it says that President Trump "asked [Mr. Perlmutter] *for help putting a government together*," after which "Perlmutter *offered* to be an *outside advisor*" and moreover that *Perlmutter*, not the VA or President Trump, "enlisted the assistance of his friends Sherman and Moskowitz."   Defs.' Mot. Ex. A at 4, ECF No. 11-2 (emphasis added).[6]   Paragraph 29 therefore does not plausibly suggest that the *VA* took any action, much less action to appoint the Three Individuals to a FACA committee.

Lacking any facts indicating that the VA took such action, VoteVets relies on constructive theories that the VA established a committee by "invit[ing] the . . . input" of the Three Individuals

---

[6] VoteVets objects that this and other articles are not "integral" to its claims and thus cannot be used to "raise questions about [its] factual allegations." Pl.'s Opp'n at 16 n.12. But VoteVets concedes that the articles *are* integral to its claims: they are, in VoteVets' words, "the source of certain factual allegations[.]" *Id.* (citation omitted).   Thus, while VoteVets may be correct that "Rule 10(c) does not require [it] to adopt *every* word in [the articles] as true for pleading purposes[,]" *id.* (emphasis added, citation omitted), VoteVets plainly has adopted them as true to the extent of the propositions for which they are cited. *Cf. Twombly*, 550 U.S. at 568 n.13 (district court "was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn" (citing Fed. R. Evid. 201)). VoteVets' cited case is not to the contrary; rather it related to use of outside materials to introduce new factual allegations beyond those for which the plaintiff cited them.  *See In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 70-72 (D.D.C. 2016).  Regardless, VoteVets "likewise invites the Court 'to independently examine the documents and form its own conclusions[.]'" Pl.'s Opp'n at 16-17 n. 12.   The articles therefore can and should be considered, at least insofar as they provide the basis for VoteVets' factual contentions, which they do in paragraph 29.

and "solicit[ing] [their] views and engagement." Pl.'s Opp'n at 16-17. VoteVets contends, for example, that "the VA invited the Council's input on how the VA's mobile app project related to its electronic health record modernization project." Pl.'s Opp'n at 16. In fact, in the cited email, Dr. Shulkin simply forwarded an email from a member of the MITRE group formally retained by the VA to review the Cerner contract and states: "See below – may be worth discussing on Tuesday." FAC ¶ 66 n.113. That is hardly a formal solicitation of advice. In any event, agency officials do not establish a FACA committee simply by soliciting the viewpoints of outside individuals or groups. If they did, *Public Citizen* would have come out differently. *See Public Citizen*, 491 U.S. at 451, 478 (no FACA committee even though "[t]he committee's views [we]re sought on a regular and frequent basis, [we]re given careful consideration, and [we]re usually followed by the Department") (Kennedy, J., concurring)).

VoteVets also generally makes much of the fact that the VA "request[ed] that the Council review the Cerner contract" and that the Three Individuals signed nondisclosure agreements to do so, Pl.'s Opp'n at 16, but there is nothing remarkable about that. At least forty-five other non-VA individuals reviewed the Cerner contract and signed similar nondisclosure agreements to do so.[7] These individuals were associated with a range of private organizations, including MITRE, which prepared a lengthy report summarizing its conclusions on the Cerner contract, as well as HealthSouth, Sutter Health, Mayo Clinic, Harvard Medical School/Boston Children's Hospital, Kaiser Permanente, and many others.[8] Thus, the fact that the Three Individuals were given limited

---

[7] *See* Dep't of Veterans Affairs, Office of Privacy and Records Management, https://www.oprm.va.gov/docs/foia/EmailsPORto62218Redacted.PDF (last visited Feb. 21, 2019) at 44.

[8] *Id.*; *see also id.* at VA Electronic Health Modernization, Request for Proposal, Interoperability Review Report, MITRE (Jan. 2018) (presenting MITRE views on Cerner contract), https://www.oprm.va.gov/docs/foia/VAEHRMInteroperabilityReviewReportJan2018%20FINAL Redacted.PDF (last visited Feb. 21, 2019).

access to confidential information in order to provide their thoughts on the Cerner contract as well, and signed nondisclosure agreements as a prerequisite to that review, is not indicative of a FACA committee. *See Public Citizen*, 491 U.S. at 478 (advisory group was not FACA committee, notwithstanding fact that agency "disclose[d] to [it] . . . confidential Government information"). Indeed, VoteVets fails to explain why, among the many people from various outside organizations who reviewed the Cerner contract and signed nondisclosure agreements, only the Three Individuals were transformed into a FACA committee by doing so.

VoteVets also contends that "[c]ase law confirms" that it has stated a claim, but neither of the two cases it cites are remotely on point. Pl.'s Opp'n at 18-19. In *Center for Biological Diversity v. Tidwell*, the court *rejected* the plaintiff's theory that non-federal scientists were de facto members of an EPA strategy team because, among other things, the non-federal scientists could not vote in or veto the decisions of the strategy team at issue. 239 F. Supp. 3d 213, 224-25 (D.D.C. 2017). Moreover, it was undisputed that the agency had actually convened a strategy team with an established membership and a specific advisory function; thus, the only question was whether the non-federal scientists were de facto members of that team. *Id.* at 24. Here, VoteVets does not contend that the Three Individuals had a vote or a veto in any advisory group made up of *VA* officials; rather, it contends that the Three Individuals were a FACA committee *of their own*, even though such a "Council" was never actually formed by the VA, has no VA-given name, and no VA-given mandate. *See* Pl.'s Opp'n at 11 (arguing that the "Council" possesses a "'fixed membership' . . . consisting of Mr. Perlmutter, Mr. Moskowitz, and Mr. Sherman"); *id.* at 15 (quoting Three Individual's own statement reprinted at FAC ¶ 74(o) to attribute purpose of the "Council").

VoteVets' reliance on *Northwest Forest Resource Council v. Espy*, 846 F. Supp. 1009 (D.D.C. 1994), is similarly misplaced.  The Forest Ecosystem Management Assessment Team in that case was actually "established" by White House officials and a formally-constituted inter-agency "Executive Committee" after a day-long "forest conference" attended by several high level officials, including the President, and it had—among other indicia of a formal deliberative body— a formal name, a specific mandate given by the President to craft policy on forest management, guidance from the Executive Committee as to how to carry out that mandate, an allotment of federal funds, and a governance structure consisting of six subteams and "14 advisory subgroups to provide it with biological impact assessments."  *Id.* at 1011-12 & n.3.  Moreover, its work culminated in a 1,000-page report that was subsequently reflected in a "Forest Plan" adopted by the President, leading the court to conclude that "[b]y any fair interpretation of the facts[,] . . . FEMAT  was an advisory committee . . . in form and function[.]"  *Id.* at 1012.  The Three Individuals, in contrast, do not have a committee name, subteams, a VA-given mandate, or any apparent governance structure, and they did not receive federal funds or prepare any work product reflecting any final decision, much less a 1,000 page report.  Thus, if anything, the very different facts of *Espy* merely serve to illustrate why VoteVets has *not* stated a claim for a de facto FACA committee here.  *See Citizens for Responsibility & Ethics in Washington v. Leavitt*, 577 F. Supp. 2d 427, 433 (D.D.C. 2008) (distinguishing *Espy* on similar grounds and concluding that no FACA committee existed).

Finally, VoteVets suggests that the reason it cannot meet its pleading burden is because it "has not yet had *any* opportunity to adduce or offer evidence[.]"  Pl.'s Opp'n at 17 (emphasis in original); *see also id.* at 19 n.13 (attempting to distinguish Circuit case law on grounds that it was decided at summary judgment, rather than on the pleadings).  Actually, VoteVets *has* had

substantial opportunity to adduce evidence to support its theories through its remedies under FOIA, yet as the VA has pointed out, the hundreds of pages of FOIA materials adduced so far in no way support, and in many ways undercut, VoteVets' claims. *See* Defs.' Mot. at 24-25. In any event, because *Twombly* requires a plaintiff to have a plausible legal theory *before* it files its lawsuit, discovery is not a device to obtain that plausible theory in the first place. *Twombly*, 550 U.S. at 557 (factual allegations must "raise a reasonable expectation that discovery will reveal evidence" of illegal conduct); *see also, e.g.*, *Wuterich v. Murtha*, 562 F.3d 375, 386-87 (D.C. Cir. 2009) (rejecting "discovery demands [that] appear to be nothing more than a fishing expedition for facts that might give rise to a viable . . . claim" and discussing Circuit precedent that "unequivocally *rejected the plaintiffs' pleas for discovery in order to find facts that would lend credence to [FACA] complaint*" (citing *In re Cheney*, 406 F.3d 723 (D.C. Cir. 2005)); *Leavitt*, 577 F. Supp. 2d at 434 (denying FACA plaintiff's request for discovery).

II.     **The FAC Does Not Plausibly Suggest that the VA Strictly Managed or Controlled the Three Individuals**.

VoteVets' claim that the Three Individuals were "utilized" by the VA is similarly implausible. As VoteVets concedes, Pl.'s Opp'n at 20, the term "utilized" under FACA is a term of art meaning "so 'closely tied' to an agency as to be amenable to 'strict management by agency officials.'" *Washington Legal Found.*, 17 F.3d at 1451 (citations omitted); *see also Byrd*, 174 F.3d at 247 (holding that the "utilized test is a stringent standard" requiring a showing of "actual management or control of the advisory committee" (citations omitted)). Thus, VoteVets' assertions of "close[] tie[s]" and "tight bonds" between the VA and the Three Individuals, Pl.'s Opp'n at 20, do not give rise to a FACA committee unless they demonstrate that the Three Individuals were "*amenable to strict management by*" the VA. They do not.

11

VoteVets seeks to show management or control through its contentions that one or more of the Three Individuals generally "met and corresponded with leaders and staff at the VA" at various times, Pl.'s Opp'n at 20, and the VA asked them for "advice on certain projects," *id.* at 22, such as the Cerner contract.  However, as with the term "establish," meeting with outside individuals and requesting their input is not management or control, even if those interactions were frequent.  If it were, the committee in *Public Citizen* would have been held to be a FACA committee and three decades of FACA jurisprudence would have come out differently.  *See Public Citizen*, 491 U.S. at 478 (finding no FACA committee despite fact that advisory group "perform[ed] no other significant function beyond advising the Government on judicial appointments" and had done so for four decades); *Byrd*, 174 F.3d at 242 (no FACA committee despite fact that "several EPA employees . . . attended [advisory group's] meeting[s]"); *Washington Legal Found.*, 17 F.3d at 1450-51 (no FACA committee despite fact that agency officials were members of and met with advisory group).

VoteVets also claims that the VA "tasked the Council with specific to-dos," Pl.'s Opp'n at 16, but neither the FAC nor the supporting FOIA materials remotely support that contention. Indeed, in the very next sentence, VoteVets clarifies what it means by this:  the "VA invited the [Three Individuals'] input" on the Cerner contract, Pl.'s Opp'n at 16, which is not at all the same as management and control.  Nor does the fact that the Three Individuals signed nondisclosure agreements in order to view the Cerner contract demonstrate that the VA managed them, as VoteVets suggest, *id.*  It merely shows that the Three Individuals agreed to keep the information confidential as a prerequisite to viewing it, as did more than forty other individuals who signed the same nondisclosure agreements.  *See supra* at 8-9; *see also* FAC ¶¶ 48, 67, 74(j) (discussing nondisclosure agreement signed by other parties, such as Apple).

VoteVets further confuses the VA being "in charge" of programs and issues at the agency (which of course it is), with the VA being "in charge" of the Council. *See* Pl.'s Opp'n at 21-22. For instance, VoteVets relies on an email in which, after Dr. Moskowitz circulated an organizational email for the "VA-Apple-[Electronic Medical Record] Project," VA official Darin Selnick wrote to Dr. Moskowitz that:

> Your email from earlier today was forwarded to me.  There seems to be some to be some misunderstanding as to my role as I was not on the email nor am I listed in it. As you know, I have had the VA responsibility to provide the overall responsibility to manage and provide oversight for the VA/Apple/Center partnership.  I still do have that responsibility.  Please add me to the Mid Level Project Manager list, as I coordinate with Rob and [redacted] update Dr. Shulkin, I communicate on a regular basis with [redacted] from Apple, and update [redacted] at the WH.  I would also appreciate you cc me in your communications on this project with VA staff, Rob and [redacted].[9]

Pl.'s Opp'n at 21-22.  This email, as its full text shows (and as VoteVets concedes, FAC ¶ 56), relates to the management of the "*VA/Apple/Center partnership*," which is not the subject of this lawsuit.  As noted above, VoteVets posits the existence of a "Mar-a-Lago Council" comprised of only *the Three Individuals*.  *See supra* at 9; Pl.'s Opp'n at 11 ("From the start . . . the Mar-a-Lago Council has been a committee with a 'fixed membership' . . . consisting of Mr. Perlmutter, Mr. Moskowitz, and Mr. Sherman.").  Mr. Selnick's email says nothing about the VA managing the affairs of the Three Individuals as their own advisory body.   In fact, it is clear from the context of this email that his reference to "management" was in relation to a list circulated by Dr. Moskowitz that named a *different* VA official, Rob Thomas, as a "Mid level project Manager[]" for the VA (along with several other "Mid level project Managers" from Apple, Johns Hopkins,

---

[9]   Dep't of Veterans Affairs, Office of Privacy and Records Management, https://www.oprm.va.gov/docs/foia/DSTBCSto62218Redacted.PDF (last visited Feb. 21, 2019) at 252.

Cleveland Clinic, Mayo Clinic, and other organizations).[10]  Thus, the email merely clarified Mr.

Selnick's role *within* the VA as it pertained to this list.  And to the extent that the list is in any way

relevant to VoteVets' FACA theory here, it shows that the VA did *not* strictly manage the

Apple/Center efforts but rather participated co-equally with numerous non-governmental

representatives.  *See, e.g.*, *Byrd*, 174 F.3d at 247 ("even 'significant' influence does not represent

the level of control necessary to establish that a government agency 'utilized' an advisory panel"

because "'influence is not control'" (citation omitted)).

VoteVets also relies on a second email in which a VA official purportedly "assert[ed] that

he [was] empowered to 'salvage' the Council's work."  Pl.'s Opp'n at 22.  In fact, the email simply

*asked* Dr. Moskowitz what the official could "do to salvage the group's work and expertise" after

*Dr. Moskowitz* "expressed frustration at the *VA's slow progress in implementing* the [Three

Individuals'] recommendations."  FAC ¶ 60.  Tellingly, "[t]he [Three Individuals]"—*not* the VA—

then allegedly "decided that a conference call meeting would be required 'to rescue this very

important initiative.'"  *Id.* Thus, as with so many of the other exchanges alleged in the FAC, this

email only reinforces the conclusion that Dr. Moskowitz and the other individuals did not view the

VA as supervising or managing their work, but rather "'view[ed] themselves as making the

decisions.'"   FAC ¶ 41; *see also, e.g.*, *id.* ¶ 49 (VA official Darin Selnick deferring to Dr.

Moskowitz on areas of focus for project with five medical centers); Pl.'s Opp'n at 9 (asserting that

Mr. Selnick viewed the Three Individuals as "principles" of the Apple project (citing FAC ¶ 51));

Defs.' Mot. at 24-25.   The email therefore *undercuts*—not supports—VoteVets' claims of

management and control.

---

[10] *Id.* at 253.

III.     **The FAC Does Not Plausibly Suggest that the Three Individuals Operated as a "Council" or Similar Group.**

Although the Court need not reach the issue, given VoteVets' failure to plausibly allege that the VA established or managed the purported "Mar-a-Lago Council," independently fatal to VoteVets' claim is its failure to allege facts suggesting that the Three Individuals operated as a "committee," "council . . . or similar group" within the meaning of FACA.  *See* 5 U.S.C. app. 2 § 3(2).  A "committee" is a "group of people appointed for a specific function," and a "council" is "'[a] deliberative assembly, specif[ically], a group of people elected or chosen to make rules, laws, or decisions, or to give advice.'"  Pl.'s Opp'n at 11 (emphasis added; citing Black's Law Dictionary (10th ed. 2014)).  Thus, the D.C. Circuit has explained that a group is a FACA advisory committee only "when it is asked to render advice or recommendations, as a *group*, and not as a collection of individuals."  *AAPS*, 997 F.2d at 913.  The group's activities must be "expected to, and appear to, benefit from the interaction among the members both internally and externally[,]" such that the "whole . . . [is] greater than the sum of [its] parts."  *Id.* at 913-14.  In addition, a plaintiff must show that the group has minimum indicia of formality, including "in large measure, an organized structure, a fixed membership, and a specific purpose."  *AAPS*, 997 F.2d at 914.  VoteVets demonstrates none of these things.

A.     **The FAC Does Not Plausibly Allege the Existence of a Council with a Fixed Membership and Organized Structure.**

First, VoteVets fails to allege facts indicating the existence of a council with a fixed membership *of the Three Individuals*.  An exceedingly small percentage of the correspondence and initiatives alleged in the FAC involved all of the Three Individuals and only those Individuals. Instead, they involved a great many other individuals from other public and private organizations, including but not limited to numerous private medical centers, Apple, MITRE, Kaiser Permanente, CVS, various tissue bank organizations, the Department of Defense, the Food and Drug

Administration, and many others, *see, e.g.* FAC ¶ 36(v), (z), 51-52, 57, 65, 70, 71, but often only

one or two of the Three Individuals.  *See* Defs.' Mot. at 20.  Thus, for example, the FOIA materials

indicate that *Dr. Moskowitz* was intimately involved in efforts leading to a public Medical Device

Registry Summit, as were many other individuals, but there is no indication that Mr. Sherman and

Mr. Perlmutter were involved in those efforts.[11]  Unsurprisingly then, when Dr. Shulkin gave an

opening speech at the Summit, he thanked only Dr. Moskowitz, not the Three Individuals as a

group, for being a driving force behind the summit.[12]  *Cf.* 41 C.F.R. 102-3.40(e) (FACA not

implicated where members of group act individually).  And while all of the Three Individuals did

participate in *some* of the activities at issue, such as a review of the Cerner contract, they were

accompanied in that effort by many others, such as individuals from the Mayo Clinic, MITRE,

Sutter Health, Kaiser Permanente, American College of Surgeons, Johns Hopkins University,

HealthSouth, and many more.[13]  VoteVets fails to identify a single VA initiative in which the

viewpoints of all of the Three Individuals, and only those Three Individuals, were brought to bear.

    As to VoteVets' efforts to demonstrate that the alleged "Mar-a-Lago Council" had an

"organized structure," they are purely conclusory.  VoteVets contends that Mr. Perlmutter was the

de facto "chairman" of the Council and Mr. Sherman and Dr. Moskowitz were its "members," but

---

[11]   *See* Dep't of Veterans Affairs, Office of Privacy and Records Management, https://www.oprm.va.gov/docs/foia/CalendarsDJSwBMIPMSRedacted.PDF, at 2 (last visited Feb. 21, 2019) (referring to "Medical Device Registry Summit/*Bruce Moskowitz* efforts"); https://www.oprm.va.gov/docs/foia/EmailsJHBto622181Redacted.PDF, *at, e.g.*, 2, 8, 11, 17-20, 31, 34, 41, 45, 51, 54, 61, 72, 81, 87, 95, 102, 115, 125 (copying only Dr. Moskowitz, not Mr. Sherman or Mr. Perlmutter, on correspondence relating to summit).

[12]   *See* Dep't of Veterans Affairs, Office of Privacy and Records Management, https://www.oprm.va.gov/docs/foia/EmailsPORto62218Redacted.PDF (last visited Feb. 21, 2019) at 7.  *See also* FAC ¶ 61.

[13]   *See* Dep't of Veterans Affairs, Office of Privacy and Records Management, https://www.oprm.va.gov/docs/foia/EmailsPORto62218Redacted.PDF (last visited Feb. 21, 2019) at 41-44.

it alleges no facts supporting that conclusion.  And the FAC is devoid of allegations as to how the Three Individuals organized deliberations among themselves at all, or even that they did deliberate among themselves, much less did so in an organized and structured way.  Instead, the FAC is entirely focused on participation by one or more of the Three Individuals in meetings with other participants—such as Apple, MITRE, medical centers, and VA officials—none of whom are alleged to be members of the purported council.  These activities say nothing about any organized structure among the *Three Individuals* themselves.

**B. The FAC Does Not Plausibly Allege that the "Whole" of the Three Individuals Was Greater than the Sum of its Parts.**

For similar reasons, VoteVets has not plausibly alleged that the Three Individuals acted as a *deliberative* body.  Specifically, VoteVets has not plausibly demonstrated that the Three Individuals sought to synthesize or reconcile "diverse views" or that their activities benefitted ""interaction among [themselves]" such that the "whole" of their work was "greater than the sum of the parts."  *AAPS*, 997 F.2d at 913-14; *see also In re Cheney*, 406 F.3d at 730 (important indication of whether a group is a FACA committee is whether it involves "deliberations or an[] effort to achieve consensus on advice and recommendations"  (emphasis added)).

VoteVets suggests that this element is satisfied because "the Council members—together—edited the [VA's form nondisclosure agreement] to ensure they could discuss the project with each other."  Pl.'s Opp'n at 13.  This is not what occurred.  Rather, *Mr. Perlmutter* conducted a markup of the agreement and shared that markup with Mr. Sherman and Dr. Moskowitz.[14]  Moreover, Mr. Perlmutter's edits say nothing about discussing the project with Mr. Sherman or Dr. Moskowitz

---

[14]   *See* Dep't of Veterans Affairs, Office of Privacy and Records Management, https://www.oprm.va.gov/docs/foia/EmailsPORto62218Redacted.PDF   (last visited Feb. 21, 2019), at 33-37.

but simply clarified that the confidential information would not be disclosed to "any person other than the President of the United States or a member of his administration to whom the President authorizes, another person subject to an equally restrictive Non-Disclosure Agreement related to the subject matter of this Agreement, [or] the Secretary of the" VA.[15]   And tellingly, when VA official Scott Blackburn emailed the Three Individuals about their offer to review the Cerner contract, he said "*Thank each of you* for agreeing to lend an extra set of outside eyes on the HER contract" and offered a call to orient the Three Individuals to the Cerner contract, if they chose, "either . . . all together . . . or separately[.]"[16]   Nothing about this exchange, therefore, suggests that the "whole" of the Three Individuals was more than the "sum of its parts."  *AAPS*, 997 F.2d at 914.

VoteVets also suggests that it has met its burden to show a deliberative body through allegations of various "brainstorming sessions" and "information-gathering calls" and emails. Pl.'s Opp'n at 14.  As the VA pointed out its moving papers, however, the vast majority of these calls and emails simply do not implicate FACA at all because they clearly were "informal exchanges, arranged on an ad hoc basis" and involved only "one or two of the purported council members[.]"  Defs.' Mot. at 21 (citing *Food & Water Watch v. Trump* ("*FWW*"), No. 17-1485-ESH, 2018 WL 6448634, at *7-8 (D.D.C. Dec. 10, 2018)); *see also Nader v. Baroody*, 396 F. Supp. 1231, 1234 (D.D.C. 1975); *Huron Envtl. Activist League v. EPA*, 917 F. Supp. 34, 42 (D.D.C. 1996).[17]   Moreover, these information-gathering calls and brainstorming sessions plainly were not

---

[15]   Dep't of Veterans Affairs, Office of Privacy and Records Management, https://www.oprm.va.gov/docs/foia/EmailsPORto62218Redacted.PDF   (last visited Feb. 21, 2019), at 34.

[16]  *Id.* at 33.

[17]  Thus, VoteVets is mistaken to suggest that "Defendants cite no case law supporting their assertion that" the types of brainstorming sessions and information-gathering calls alleged here "are strangers to the FACA."  Pl.'s Opp'n at 13-14.  *See also* 41 C.F.R. § 102-3.160 (excluding

meetings of the purported "*Council*"—*i.e.*, Dr. Moskowitz, Mr. Sherman, and Mr. Perlmutter—but rather involved countless other private sector participants across a range of sectors and institutions, and the majority of such calls and meetings involved only one or two of the Three Individuals.  *See* Defs.' Mot. at 20.  None suggest that the *Three Individuals* "significantly interact[ed]" with one another or sought to reconcile "diverse views" among *themselves* in presenting their opinions to the VA.  *AAPS*, 997 F.2d at 913-15.[18]

### C. The FAC Does Not Plausibly Allege that the Three Individuals Had a Specific VA-Bestowed Purpose.

VoteVets also does not plausibly suggest that the Three Individuals had a specific purpose. It contends that the purpose of the purported Council was to "assist the President, Secretary and VA leadership in their making the essential decisions . . . that affect our nation's veterans," Pl.'s Opp'n at 15, but such a purpose—which appears to be coextensive with the entirety of the VA's jurisdiction—is hardly "specific."  Nor does VoteVets plausibly allege that such a purpose was bestowed by the *VA*; rather, VoteVets simply cites the Three Individuals' own statement reprinted at page 40 of the FAC.  Such a statement by the Three Individuals themselves is inadequate to suggest any VA-assigned function, much less a "specific" one.  Moreover, the wide range of topics in which the Three Individuals were allegedly involved, which—in VoteVets' own words—constituted a "laundry list," Pl.'s Opp'n at 20, and ran the "gamut," *id.* at 7, also demonstrates that they lacked the requisite specificity of purpose.

In sum, the de facto "Council" that VoteVets posits bears none of the indicia that the D.C.

---

from FACA's open meeting requirements "preparatory" work and meetings "of two or more advisory committee . . . members convened solely to gather information, conduct research, or analyze relevant issues and facts in preparation for a meeting of the advisory committee").

[18] VoteVets also suggests that this element is satisfied because the "Council members have taken pains to keep each other updated[.]"  Pl.'s Opp'n at 13.  However, "updat[ing]" is not the same thing as deliberating.

Circuit has held are critical to make out a FACA claim.

## IV.        VoteVets Lacks Standing.

Finally, VoteVets lacks informational standing.  As VoteVets concedes, to make out informational standing, it must show, among other things, that it suffers, "'by being denied access to [the Three Individuals'] information[,]' . . . 'the type of harm Congress sought to prevent by requiring disclosure.'"  Pl.'s Opp'n at 23 (citing *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)).  It cannot do so because, as the Supreme Court has held: "*Congress did not intend* that" FACA extend "to any group of two or more persons . . . from which the President or an Executive agency seeks advice," but rather intended that the Act extend only to those groups that are established or managed by the Executive Branch.  *Pub. Citizen*, 491 U.S. at 452 (emphasis added); *see also In re Cheney*, 406 F.3d at 728 ("*Congress could not have meant* that participation in committee meetings or activities, even influential participation, would be enough to make someone a member of the committee . . .  Separation-of-powers concerns strongly support this interpretation of FACA." (emphasis added)).[19]  Thus, as this very court recently held in a case involving the same counsel that represents VoteVets here, an implausible *de facto* theory cannot support standing to raise a FACA claim.  *See generally FWW*, 2018 WL 6448634; *cf. Claybrook v.*

---

[19] VoteVets is incorrect to contend that the separation of powers concerns discussed in *In re Cheney* do not apply here because "an executive agency[] present[s] no such problems."  Pl.'s Opp'n at 19 n.13.  First, VoteVets' theories *do* significantly implicate the President. *See, e.g.*, FAC ¶ 29 (President Trump "named" the Three Individuals to lead and serve on the "Council"); *id.* ¶ 31 (alleging that the Three Individuals "maintain personal relationships with President Trump"); *id.* ¶ 36(a), (b), (i) (discussing meetings and press conferences with the President in which the Three Individuals allegedly participated); *id.* ¶¶ 43, 73 (alleging that the nomination and the "firing of David Shulkin" were based on the recommendations of the Three Individuals).  Moreover, the D.C. Circuit has recognized that the separation of powers concern extends to the confidential communications of all "'high Government officials," not just the President.  *AAPS*, 997 F.2d at 909 (citing *United States v. Nixon*, 418 U.S. 683, 705-06 (1974) (footnotes omitted)).

*Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997) (declining to accept the plaintiff's legal theory in FACA case and affirming dismissal for lack of standing because "if the plaintiff's claim has no foundation in law, he has no legally protected interest and thus no standing to sue").

Rather than engage with (or even acknowledge) these authorities, VoteVets relies on a single case—*Judicial Watch, Inc. v. Dep't of Commerce*, 583 F.3d 871, 873 (D.C. Cir. 2009)—for the proposition that the court must assume "at the pleading stage, that for purposes of standing" the Three Individuals are a FACA committee.  Pl.'s Opp'n at 24. In other words, according to VoteVets, invoking FACA is sufficient to confer standing on any plaintiff, regardless of how conclusory or implausible the plaintiff's theories.

Nothing in *Judicial Watch*, however, negates the standard for demonstrating informational injury or suggests that a court must accept the plaintiff's say-so in determining the foundational question of whether a plaintiff has stated allegations that could plausibly give rise to a FACA committee. *Judicial Watch* was not a de facto advisory committee case like the instant case; rather, both parties in *Judicial Watch* agreed that a North American Competitiveness Council existed, that it possessed a specific membership structure consisting of "at least one sub-group made up exclusively of U.S.-based delegates," that its purpose was to advise a tri-governmental partnership involving the United States, and that United States government officials had been involved in creating the Council and in its meetings.  583 F.3d at 872; *see also* Br. for Appellees, *Judicial Watch*, *v. Dep't of Commerce* (No. 08-5490), 2009 WL 1643334 (D.C. Cir. Apr. 29, 2009) (conceding "that federal officials . . . provided input into the creation of the NACC and continue to meet with the NACC.").  Thus, the questions the D.C. Circuit considered in *Judicial Watch* were whether the causation and redressability components of standing were satisfied; not whether Judicial Watch had plausibly invoked FACA in the first place.  *Judicial Watch*, 583 F.3d at 873.

Here, by contrast, VoteVets has not plausibly alleged the existence of a committee or council in the first place, much less one subject to FACA.

In any event, on remand from the D.C. Circuit, the district court in *Judicial Watch* dismissed the case under Rule 12(b)(6), concluding that the complaint failed to state a claim for relief because it did not plausibly demonstrate that the Department of Commerce "'establishe[d]' or utilize[d] the NACC within the meaning of FACA[.]"  *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 35 (D.D.C. 2010).  Because VoteVets' allegations are far more deficient than those in *Judicial Watch*, to the extent this Court determines it has jurisdiction over this case, it should do the same.

## CONCLUSION

For the foregoing reasons, the Department respectfully requests that the FAC be dismissed.

Dated: February 22, 2019                   Respectfully submitted,

                                           JOSEPH H. HUNT
                                           Assistant Attorney General

                                           MARCIA BERMAN
                                           Assistant Branch Director
                                           Federal Programs Branch

                                           */s/ Serena Orloff*
                                           SERENA M. ORLOFF
                                           California Bar No. 260888
                                           Trial Attorney
                                           U.S. Department of Justice, Civil Division
                                           Federal Programs Branch
                                           1100 L Street NW, Room 12512
                                           Washington, D.C. 20005
                                           Telephone: (202) 305-0167
                                           Fax: (202) 616-8470
                                           Serena.M.Orloff@usdoj.gov

                                           *Attorneys for Defendants*