# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VOTEVETS ACTION FUND,<br><br>    *Plaintiff*,<br>  v.<br><br>UNITED STATES DEPARTMENT OF<br>VETERANS AFFAIRS *et al.*,<br><br>    *Defendants*. | Civil Action No. 18-1925 (TJK) |

## MEMORANDUM OPINION

      The Federal Advisory Committee Act imposes transparency and disclosure requirements on agencies with respect to so-called advisory committees, provisional bodies that provide them with advice or recommendations. VoteVets Action Fund, a nonprofit veterans-affairs advocacy group, alleges that the Department of Veterans Affairs has ignored these requirements as they relate to a purported advisory committee comprised of three men VoteVets dubs the "Mar-a-Lago Council." Defendants have moved to dismiss the operative complaint on two grounds, both premised on their contention that VoteVets has not plausibly alleged that the three men were an advisory committee under the statute. First, they argue, VoteVets lacks standing because if statute does not apply VoteVets has not suffered a legally cognizable injury. Second, they argue that VoteVets has failed to state a claim on which relief can be granted. For the reasons discussed below, the Court holds that VoteVets has standing, but that the complaint must be dismissed for failure to state a claim. Accordingly, the Court will grant Defendants' motion.

## I. Background

### A. The Federal Advisory Committee Act

The Federal Advisory Committee Act (FACA), Pub. L. No. 92–463, 86 Stat. 770 (1972) (codified as amended at 5 U.S.C. app. 2 §§ 1–16), governs the formation and operation of advisory committees. As relevant here, FACA defines "advisory committee" broadly to cover any group "established or utilized" by either the President or an executive agency "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." 5 U.S.C. app. 2 § 3. In enacting FACA, Congress sought to ensure that both it "and the public remain apprised of [an advisory committee's] existence, activities, and cost; and that their work be exclusively advisory in nature." *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 446 (1989).

To that end, "FACA mandates that every advisory committee 'file a charter before meeting or taking any action, hold its meetings open to the public, publish timely notice of each such meeting in the Federal Register, keep minutes and other records of its meetings, and allow interested persons . . . to attend, appear before, or file statements with the committee.'" *Food & Water Watch v. Trump*, 357 F. Supp. 3d 1, 9–10 (D.D.C. 2018) (citations omitted). FACA also requires advisory committees to "make available for public inspection and copying the various records, reports, meeting minutes, and any other documents 'which were made available to or prepared for and by' the advisory committee." *Id.* And to guard against potential bias, FACA requires an advisory committee's "membership to be fairly balanced in terms of the points of

view represented," and that the committee take steps to avoid being "inappropriately influenced . . . by any special interest." 5 U.S.C. app. 2 § 5(b)(2)–(3).[1]

**B.    Plaintiff's Lawsuit**

In August 2018, VoteVets Action Fund ("VoteVets") sued the Department of Veterans Affairs (the "Department") and Robert Wilkie in his official capacity as Secretary of Veterans Affairs (collectively, "Defendants").  ECF No. 1.  A few months later, VoteVets amended its complaint.  ECF No. 10 ("Am. Compl.").  In its amended complaint, VoteVets alleges that, since January 2017, the Department "has repeatedly sought the advice of, and acted on the basis of collective recommendations from, Ike Perlmutter, Bruce Moskowitz, and Marc Sherman," three men VoteVets calls the "Mar-a-Lago Council" (the "Council") *Id.* ¶ 2.  VoteVets alleges that the three men are an advisory committee subject to FACA.  *Id*.  VoteVets further alleges that Perlmutter, the "Chief Executive Officer for the entertainment and production company Marvel Entertainment," *id*. at ¶ 30, Moskowitz, "a doctor practicing in West Palm Beach, Florida, and the founder of Biomedical Research and Education Foundation," *id.*, and Sherman, "a managing director who specializes in financial fraud and white-collar investigations with the consulting firm Alvarez & Marsal," *id*., do not "have notable experience with issues facing veterans," *id*. ¶ 31.

VoteVets alleges that the Council was formed either in January 2017 when then President-elect Trump "named" Perlmutter its leader and Moskowitz and Sherman its other members, *id.* ¶¶ 28–29, or on February 7, 2017, when then Secretary of Veterans Affairs David

---

[1] FACA's definition of an advisory committee also includes those "established by statute or reorganization plan," *see* 5 U.S.C. app. 2 § 3(2)(A), and excludes others, *see* 5 U.S.C. app. 2 § 3, but those provisions are not at issue here.  FACA also exempts several types of advisory committees from its disclosure and transparency requirements, but those exemptions are also not at issue.  *See* 5 U.S.C. app. 2 § 4.

3

Shulkin attended a meeting with them at the Mar-a-Lago Club in Florida, *id.* ¶ 36(c). Since that time, VoteVets alleges, and through "frequent phone calls and meetings with top officials at the Department, . . . the Council's views [have been] solicited, its advice considered, and its recommendations followed on a broad range of policy and personnel matters concerning veterans." *Id.* ¶ 4.

According to the amended complaint, the three men have provided advice on at least ten policy or personnel-related subjects, *id.* ¶¶ 39–73, and they have conducted at least 30 meetings, email exchanges, or phone calls with Department officials, *id.* ¶ 36. For example, VoteVets alleges that the three men "sought to influence the [Department's] hiring process for an Under Secretary post" when "Moskowitz emailed . . . the acting Secretary, to introduce him to a candidate over email and to 'make sure his application [was] received.'" *Id.* ¶ 44 (quoting FOIA-obtained information).[2]

VoteVets also alleges that the three men have provided recommendations about the Department's ongoing projects and policy priorities. *Id.* ¶ 39. For example, VoteVets pleads that the three men recommended that the Department develop a "a mobile accessible, digital platform that would allow veterans to, among other things, find nearby medical services and easily access health records." *Id.* ¶ 46. The three allegedly "facilitated a series of calls with senior executives from the [Department] and Apple to implement the Council's recommendations" about the platform, *id.*, and remained involved in its development, *id.* ¶ 47–60. And the amended complaint cites other examples, including the three men's alleged involvement in the Department's efforts to update its electronic records system. *Id.* ¶ 64. In that

---

[2] VoteVets has incorporated into its amended complaint information it obtained from the Department through Freedom of Information Act (FOIA) requests.

4

case, the Department purportedly asked them "to sign non-disclosure agreements so that they could 'lend an extra set of outside eyes on the [relevant] contract.'" *Id.* ¶ 67 (quoting FOIA-obtained information). The amended complaint also cites a July 2018 statement the three men issued describing their interactions with the Department. *Id.* ¶ 74(o). According to VoteVets, their "use of collective pronouns (e.g., 'we,' 'our'), without exception, and [their] descriptions of how the Council set about its business," reflect their status as an advisory committee. *Id.*

The heart of VoteVets' amended complaint is its allegation that Defendants have not complied with FACA's transparency and disclosure requirements with respect to the three men's activities. VoteVets alleges that Defendants have failed to (1) provide notice in the Federal Register of their "meetings," (2) make "available any material" they have "generated or received in connection with [their] meetings or with [their] work more generally," and (3) "[keep] or [publish] minutes" of their meetings. *Id.* ¶ 37. According to VoteVets, Defendants' failure to make these disclosures has prevented it from accessing information to which it is entitled, *id.* ¶¶ 77, 79, and has precluded it from participating in the three men's meetings, *id.* ¶¶ 38, 76, 79. As a result, VoteVets alleges Defendants have "unlawfully withheld or unreasonably delayed agency action" and "acted contrary to the law" under 5 U.S.C. §§ 706(1) and 706(2)(A). *Id.* ¶¶ 82–85.

Defendants moved to dismiss the amended complaint. *See* ECF No. 11-1 ("MTD Br.") at 7–21. VoteVets opposed the motion, ECF No. 13 ("Opp'n"), and Defendants replied, ECF No. 16 ("Reply").

## II. Legal Standard

Under Rule 12(b)(1), a defendant may move to dismiss a claim for lack of standing. "The federal courts are courts of limited jurisdiction, and they lack the power to presume the existence of jurisdiction in order to dispose of a case on any other grounds." *Tuck v. Pan Am.*

5

*Health Org.*, 668 F.2d 547, 549 (D.C. Cir. 1981). Standing is essential to that jurisdiction; "[a] defect of standing is a defect in subject matter jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). Thus, "[w]hen a defendant challenges a plaintiff's standing to bring a lawsuit, the defendant's motion is properly understood as a motion to dismiss for lack of subject matter jurisdiction under [Rule] 12(b)(1)." *Fox v. McCormick*, 20 F. Supp. 3d 133, 139 (D.D.C. 2013). When evaluating a motion to dismiss under Rule 12(b)(1), the Court may consider "undisputed facts [evidenced in the record] plus the court's resolution of disputed facts," including by looking outside the pleadings. *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003). And "[p]laintiffs' factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion." *D.C. Ret. Bd. v. United States*, 657 F. Supp. 428, 431 (D.D.C. 1987) (citation omitted).

Additionally, under Rule 12(b)(6), a defendant may move to dismiss a claim because the plaintiff has failed to state a claim upon which relief can be granted. To withstand dismissal, "a court must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. D.C.*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)). "In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice." *Richardson v. Sauls*, 319 F. Supp. 3d 52, 61 (D.D.C. 2018). Before discovery, courts "must 'accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor.'" *Hurd v. D.C., Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). But courts

may not assume the truth of "mere conclusory statements" or draw inferences that are implausible based on the facts alleged. *Iqbal*, 556 U.S. at 678. "Nor must [courts] accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004). And "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

## III. Analysis

Defendants move to dismiss the amended complaint on two grounds. First, they argue that the Court lacks subject-matter jurisdiction under Rule 12(b)(1) because VoteVets has failed to show it has standing. Second, they argue that VoteVets' amended complaint has failed to state a claim on which relief can be granted under Rule 12(b)(6). Because standing is a threshold question that must be addressed before turning to the merits, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), the Court begins there.

### A. VoteVets Has Standing

The plaintiff bears the burden of establishing standing at the pleading stage. *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). To carry this burden, "a plaintiff must show that (i) it has 'suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision.'" *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015) (quoting *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014)). "In reviewing the standing question, [the Court] must be 'careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.'" *In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008) (quoting *City of Waukesha*

*v. EPA*, 320 F.3d 228, 235 (D.C.Cir.2003)); *see also Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017) (observing "[t]he longstanding rule that for standing purposes we assume the merits in favor of the plaintiff").

The core of the parties' standing dispute is whether VoteVets was injured. For informational standing—on which VoteVets relies here—"a plaintiff [generally] suffers sufficiently concrete and particularized informational injury" if "it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and . . . it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals*, 828 F.3d. at 992. Under FACA, to demonstrate such an injury a plaintiff need only show that an agency failed to comply with the statute's disclosure and transparency requirements. *Byrd v. U.S. E.P.A.*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citation omitted). Obviously, VoteVets has pleaded that Defendants failed to do so here. *See* Am. Compl. ¶¶ 10, 76, 79.

Defendants' main argument is that VoteVets cannot show that it was injured—deprived of information to which it was entitled—because it has not adequately pleaded that the three men were an advisory committee under FACA. *See* MTD Br. at 14; Reply at 20-22. But for the purpose of determining standing, the D.C. Circuit has instructed that the Court must assume that the three men were in fact such a committee. *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 583 F.3d 871, 873 (D.C. Cir. 2009) (noting that "[w]e assume, as we must at the pleading stage, that for purposes of standing the Council and its assorted subgroups are, as alleged, 'advisory committees' within the meaning of FACA"). Assuming they were, VoteVets is entitled to the information required to be disclosed under the statute and "a refusal to provide information to

which [a plaintiff] is entitled under FACA constitutes a cognizable injury sufficient to establish Article III standing," *Byrd*, 174 F.3d at 243. Accordingly, VoteVets has standing.[3]

Defendants' other arguments are similarly unavailing. VoteVets need not demonstrate an organizational injury to supplement its informational one. *Ctr. for Biological Diversity v. United States Dep't of State*, No. CV 18-563 (JEB), 2019 WL 2451767, at *3 (D.D.C. June 12, 2019) ("Deprivation of information to which an organization has a statutory right and the loss of which causes harm is—as it would be for an individual—sufficient to confer standing. In other words, there is no need for the plaintiff to allege resource expenditure."). And VoteVets need not, as Defendants argue, have affirmatively sought and been denied information for which FACA requires disclosure to have suffered an injury. *Cummock v. Gore*, 180 F.3d 282, 289 (D.C. Cir. 1999). Finally, Defendants' arguments about causation and redressability fail because the Court, as described above, must assume for standing analysis purposes that the three men were an advisory committee. *See Judicial Watch*, 583 F.3d at 873. Assuming they were, VoteVets easily clears those standing hurdles.

### B.     VoteVets Has Failed to State a Claim

As discussed above, FACA requires that an advisory committee be "established or utilized" by either the President or a federal agency. VoteVets argues that it has plausibly alleged that both President Trump and Defendants established the three men as an advisory committee and that, since then, Defendants have utilized them as one. The Court disagrees. To

---

[3] The Court is aware that at least one other court in this district has dismissed a FACA complaint on standing grounds because the plaintiff failed to adequately plead the existence of an advisory committee. *See Food & Water Watch*, 357 F. Supp. 3d at 16 n.6. And that approach has intuitive appeal. But the Court interprets that path as foreclosed by the D.C. Circuit in *Judicial Watch,* 583 F.3d at 873.

state a claim under FACA, VoteVets must allege more than Defendants' mere receipt of advice from a few private citizens, albeit on many occasions.

> 1. **VoteVets Has Not Plausibly Alleged that President Trump or Defendants "Established" an Advisory Committee**

An advisory committee is "established" under FACA if it is "actually formed by the agency." *Byrd*, 174 F.3d at 245.[4] This requirement suggests that the government must take formal, affirmative steps to "establish" one. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C. Cir. 1993) ("Since form is a factor, it would appear that the government has a good deal of control over whether a group constitutes a FACA advisory committee."). As a result, "it is a rare case when a court holds that a particular group is a FACA advisory committee over the objection of the executive branch." *Id*.

VoteVets alleges that in January 2017, the Council was created to "help . . . straighten out" the Department by "advis[ing] [it] on policy issues affecting veterans and [on its] administration." Am. Compl. ¶ 28. The amended complaint cites as the source of this allegation a news conference held by President-elect Trump. *Id.* ¶ 28 n.7 (citing Natalia Wojcik et al., *Read the Transcript From Trump's News Conference*, CNBC (Jan. 11, 2017), https://www.cnbc.com/2017/01/11/transcript-of-president-elect-donald-j-trumps-news-conference.html ("News Conf. Transcript").[5] The amended complaint further alleges that

---

[4] Several of the cases referenced in the Court's analysis were decided on summary judgment, and the Court cites to them solely to illustrate important elements of an advisory committee's definition under FACA. Obviously, VoteVets need not prove the existence of an advisory committee at this stage of the litigation. But it does need to plausibly allege that an advisory committee was either "established" or "utilized" as those terms are understood in the FACA context.

[5] VoteVets states that "it has substantiated certain of its allegations with reference to public reporting." Opp'n at 16 n.12. And the Court may consider any documents or information referenced in the amended complaint in resolving a motion to dismiss. *Richardson*, 319 F. Supp. 3d at 61.

President Trump "named Isaac 'Ike' Perlmutter to lead the Council, and Bruce Moskowitz and Marc Sherman to serve on the Council." *Id.* ¶ 29.

The transcript of the news conference cited in the amended complaint reflects a free-wheeling event during which President-elect Trump—who, obviously, had not yet assumed office—touched on a variety of topics ranging from border security to the F-35 joint strike fighter program. *See* News Conf. Transcript. On the issue of veterans' affairs, he stated that:

> We're going to be talking to a few people also to help [Secretary-designate David Shulkin]. And we have some of the great hospitals of the world going to align themselves with us on the Veterans Administration, like the Cleveland Clinic, like the Mayo Clinic, a few more that we have, and we're going to set up a group. These are hospitals that have been the top of the line, the absolute top of the line. And they're going to get together with their great doctors, Dr. Toby Cosgrove, as you know, from the Cleveland Clinic, has been very involved. Ike Perlmutter has been very, very involved, one of the great men of business. And we're going to straighten out the VA for our veterans. I've been promising that for a long time, and it's something I feel very, very strongly.

*Id.*

VoteVets does not plausibly allege that President-elect Trump established the three men—the purported Council—as an advisory committee. For starters, his comments appear to suggest his intention to create some sort of "group" in the future, as opposed to at that time. Moreover, he appears to have contemplated a "group" that would include an undetermined number of hospitals and doctors, including Dr. Toby Cosgrove, but the complaint does not allege that any hospital or Dr. Cosgrove is a member of the Council. And although the President-elect mentions Perlmutter, he does not reference either of the other two men alleged by VoteVets to be part of the Council.

More fundamentally, President-elect Trump's off-the-cuff comments at a press conference hardly reflect the kind of formal, affirmative steps required to establish an advisory committee. And they do not suggest that the "group" referenced would have the

11

structure required to be an advisory committee under FACA. *See Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 914 ("In order to implicate FACA, the President, or his subordinates, must create an advisory group that has, in large measure, an organized structure, a fixed membership, and a specific purpose."). Indeed, his remarks are a far cry from the sort of formal steps that plausibly allege the establishment of an advisory committee. For example, in *Center for Biological Diversity v. Tidwell*, the court found that the plaintiff had met the pleading standard by asserting that "the Forest Service announced via an 'initiation letter' that it was convening 'a team of experienced managers and scientific advisors' to develop the conservation strategy.'" 239 F. Supp. 3d 213, 218, 228 (D.D.C. 2017). VoteVets pleads no such formal step here.

The amended complaint also alleges that the Department's "establishment of the Council" was "mark[ed]" in February 2017 when then Secretary Shulkin met with the three men, Am. Compl. ¶ 36(c), and when one or more of the men met or communicated with Defendants on later occasions, Am. Compl. ¶¶ 36(d)–(ii). But nowhere in the course of those allegations does VoteVets plead that anyone at the Department took any affirmative step to establish the Council. It is not enough to argue that the Department's "establishment of the Council was *confirmed* countless times over the . . . months as [Department] officers and staff met and corresponded with the Council." Opp'n at 14 (emphasis added) (citing Am. Compl. ¶ 36(g), (h), (k), (q)). The Court cannot find that those allegations plausibly allege that Defendants established the three men as an advisory committee. *See Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 923 (Buckley, J., concurring in the judgment) ("Taken literally, FACA's definition would have endowed the President with Midas ears capable of turning any continuing source of

consensus opinion into a FACA committee."); *Center for Biological Diversity*, 239 F. Supp. 3d at 218, 228.[6]

Furthermore, as Defendants note, several of the allegations in the amended complaint undercut any reasonable inference that Defendants established the three men as an advisory committee. *See* MTD Br. at 18–19. For example, the "Statement by Ike Perlmutter, Bruce Moskowitz and Marc Sherman" that VoteVets quotes at length in the amended complaint suggests that the three men—not President Trump or the Department—were the ones who took the initiative to organize themselves. Am. Compl. ¶ 74(o) (repeatedly noting that the three men offered to assist the Department on their own initiative, as opposed to being asked to assist). Similarly, while VoteVets alleges that President Trump named all three men to the Council, Am. Compl. ¶ 29, the article cited in the amended complaint as the basis for that allegation asserts that it was Perlmutter, *not* President Trump, who sought the help of the other two men, *id.* ¶ 29 n.9 (citing Isaac Arnsdorf, *The Shadow Rulers of the VA*, ProPublica (Aug. 7, 2018), https://www.propublica.org/article/ike-perlmutter-bruce-moskowitz-marc-sherman-shadow-rulers-of-the-va ("ProPublica Article")). And if the government did not select the purported advisory committee members, the law in this Circuit is unambiguous that it did not establish an advisory committee under FACA. *Byrd*, 174 F.3d at 246–47 (concluding that a panel of experts was not "a Government-formed advisory committee" because a private consulting firm picked the members even though the relevant agency had "significant potential authority in the panel

---

[6] To the extent VoteVets relies on the sheer number of alleged contacts between Defendants and the three men to bolster its claim that it has plausibly alleged that the government "established" the three men as an advisory committee or that the government "utilized" them as such, the Court is not persuaded. As another court recently concluded, "the number of meetings is not . . . particularly probative, especially where, as here, many of these 'meetings' were not meetings at all but simply email exchanges or phone calls, which apparently did not take place according to a regular schedule." *Food & Water Watch*, 357 F. Supp. 3d at 12.

13

selection process"); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 32 (D.D.C. 2010) ("In the Circuit's view, anything less than actual selection of advisory committee members is insufficient to constitute direct formation or government establishment within the meaning of the FACA.").

For the above reasons, the Court holds that VoteVets has not plausibly alleged that President Trump or Defendants "established" the three men as an advisory committee under FACA.

### 2. VoteVets Has Not Plausibly Alleged that Defendants "Utilized" an Advisory Committee

An advisory committee that was not "established" may still be covered by FACA if an agency nevertheless "utilized" it. *Byrd*, 174 F.3d at 245–46. However, the Supreme Court has significantly restricted what counts as "utilized," noting that "[r]ead unqualifiedly, it would extend FACA's requirements to any group of two or more persons, or at least any formal organization, from which the President or an Executive agency seeks advice." *Public Citizen*, 491 U.S. at 452. The *Public Citizen* Court held that Congress could not have intended that result. *Id.* at 453 ("[W]e cannot believe that [FACA] was intended to cover every formal and informal consultation between the President or an Executive agency and a group rendering advice."). Accordingly, as with "established," "utilized" is read narrowly: An advisory committee is "utilized" only if it is "so 'closely tied' to an agency as to be amenable to 'strict management by agency officials.'" *Byrd*, 174 F.3d at 246 (quoting *Public Citizen*, 491 U.S. at 441). This standard is demanding; "even 'significant' influence" by agency officials over the purported committee "does not represent the level of control necessary to establish that a government agency 'utilized' an advisory panel." *Id*. (quoting *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1451 (D.C. Cir. 1994)); *see also Judicial Watch*, 736

14

F. Supp. 2d at 32 ("[T]he government 'utilizes' a privately-formed advisory committee when agency officials exercise actual management or control over that committee.").

The amended complaint alleges that Defendants have "utilized [the Council's] advice and recommendations" in numerous policy areas, Am. Compl. ¶ 39, and that it "is exerting sweeping influence on the [Department]," *id.* (quoting ProPublica Article). For example, VoteVets alleges that "'[e]verything needs to be run by [the Council]' because '[t]hey view themselves as making the decisions.'" Am. Compl. ¶ 41 (first and third alterations in original) (quoting ProPublica Article).

Nonetheless, VoteVets has not plausibly asserted that the three men were "utilized" by the Department within FACA's meaning. The allegations in the amended complaint suggest that the alleged *advisory committee* exercised influence—perhaps in VoteVets' view undue influence—over the *agency*. But for FACA purposes, it is the amount of influence that the *agency* exercises over the *advisory committee* that matters. *See Byrd*, 174 F.3d at 246. Accordingly, the allegations throughout the amended complaint that the three men exercised influence over the *Department* undermines any reasonable inference that Defendants exercised "actual management or control" over them. *See Wash. Legal Found.*, 17 F.3d at 1450.[7] To be sure, some of the allegations in the amended complaint invoke the word "utilized." Am. Compl.

---

[7] For example, the amended complaint describes one email exchange in which a Department official shared with Sherman and Moskowitz "the three broad areas they were looking to focus on." Am. Compl. ¶ 49 (quoting FOIA-obtained information). Moskowitz allegedly "responded that '[t]hese are good areas but not the emergency ones which my group of experts have identified,' and referred [the Department official] back to his earlier email outlining priorities as the Council saw them." *Id.* (first alteration in original). Thereafter, the Department official allegedly "deferred to the Council's recommendations, responding, '[g]ot it, looking forward to discussing.'" *Id.* (alteration in original). This alleged episode, like others pleaded in the amended complaint, undermines the notion that Defendants "exercise[d] actual management or control" over the three men. *Judicial Watch*, 736 F. Supp. 2d at 32.

15

¶ 39. But "this Circuit has rejected such broad, literal interpretations of [this word] in the FACA context." *Judicial Watch*, 736 F. Supp. 2d at 35.[8]

VoteVets argues, to the contrary, that several allegations in the amended complaint adequately pleaded that the Department managed and controlled the three men. Opp'n at 21–22. First, VoteVets alleges that a Department official sent an email asking Moskowitz to include him in communications regarding a particular project. Am. Compl. ¶ 56. The official allegedly explained that he had "overall responsibility to manage and provide oversight for" that particular project. *Id.* (quoting FOIA-obtained information). This allegation, VoteVets argues, "show[s] the [Department] asserting its authority over the Council." Opp'n at 21 (citing Am. Compl. ¶ 56). However, as Defendants correctly point out, read in full the email merely reflects the official correcting Moskowitz's apparent mistake about the identity of the person within the Department who was responsible for the project. Reply at 13 (quoting FOIA-obtained information). Second, VoteVets claims the Department's management "is particularly evident" in the amended complaint's allegation that Defendants "had the Council sign non-disclosure agreements." Opp'n at 16 (citing Am. Compl. ¶ 67). But the amended complaint merely identifies a single occasion on which the Department asked the three men "to sign non-disclosure agreements so that they could 'lend an extra set of outside eyes on [a] . . . contract.'" Am. Compl. ¶ 67 (quoting FOIA-obtained information). Third, VoteVets argues that the statement issued by the three men, included in the amended complaint, in which they describe their contacts with the Department suggests that "the Council's official view is that the [Department] is in charge." Opp'n at 21; *see also* Am. Compl. ¶ 74(o). But the statement says little more than that

---

[8] Similarly, VoteVets' allegation that a White House Senior Advisor "sent a memo to a political appointee within the Department" in which he suggested Department leadership "'[u]tilize outside team (Ike)' when considering options for replacing" Secretary Shulkin, Am. Compl. ¶ 73 (emphasis omitted), is insufficient.

the three men volunteered their assistance and that they were not acting on behalf of the Department. *See* Am. Compl. ¶ 74(o). Fourth, VoteVets argues that the Department "has specifically asked the Council for its advice on certain projects and identified certain tasks for it to undertake." Opp'n at 22 (citing Am. Compl. ¶¶ 66–67). But the amended complaint does not allege that that Defendants actually tasked the three men in a way that would allow the Court to reasonably infer management or control. *See* Am. Compl. ¶ 66. Rather, it merely assets that "then-Secretary Shulkin specifically invited the Council to weigh in" on a project. *Id.*

Simply put, none of these allegations identified by VoteVets plausibly allege that the three men were "so 'closely tied' to [the Department] as to be amenable to 'strict management by agency officials.'" *Food Chem. News v. Young*, 900 F.2d 328, 333 (D.C. Cir. 1990) (quoting *Public Citizen*, 491 U.S. at 441). Nor do they adequately assert that the Department exercised "*actual management or control*" over them. *Byrd*, 174 F.3d at 246 (emphasis in original) (quoting *Animal Legal Def. Fund, Inc. v. Shalala*, 104 F.3d 424, 430 (D.C. Cir. 1997)).

For the above reasons, the Court holds that VoteVets has not plausibly alleged that Defendants "utilized" the three men as an advisory committee under FACA.

## IV. Conclusion

The Court concludes that VoteVets has standing, but that its amended complaint fails to state a claim for a violation of FACA. To be sure, the amended complaint alleges many instances in which Defendants "ma[de] use of" advice provided by the three men. *Public Citizen*, 491 U.S. at 452. But more is required to plead a cause of action under FACA. *Id.* A plaintiff must plausibly allege that an advisory committee was "actually formed" by the government or was "so 'closely tied' to an agency as to be amenable to 'strict management by agency officials.'" *Byrd*, 174 F.3d at 246 (quoting *Food Chem. News*, 900 F.2d at 333). VoteVets has done neither here, and therefore the complaint must be dismissed. For all the

above reasons, the Court will grant Defendant's Motion to Dismiss, ECF No. 11.  A separate order will issue.

                                                          /s/ Timothy J. Kelly
                                                          TIMOTHY J. KELLY
                                                          United States District Judge

Date: September 30, 2019